[No. C047605. Third Dist. June 30, 2005.]

ANDERSON FIRST COALITION et al., Plaintiffs and Appellants, v. CITY OF ANDERSON et al., Defendants and Respondents; FHK COMPANIES, INC., et al., Real Parties in Interest.

**COUNSEL**

Herum Crabtree Brown, Steven A. Herum and Brett S. Jolley for Plaintiffs and Appellants.

Fitzpatrick Law Offices and Michael C. Fitzpatrick for Defendants and Respondents.

Steefel, Levitt & Weiss, Arthur J. Friedman and Judy V. Davidoff for Real Parties in Interest.

## OPINION

**DAVIS, Acting P. J.**—In this action under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; hereinafter CEQA) and planning and zoning law, plaintiffs, which comprise the Anderson First Coalition, along with two individuals, Kathy Grissom and John Wade (collectively, Anderson Coalition or the Coalition), challenge the approval by the City Council of the City of Anderson (collectively City) of a shopping center project. The project is anchored by a Wal-Mart Supercenter store (Wal-Mart Stores, Inc. (Wal-Mart or Wal-Mart Supercenter), Wal-Mart Stores, Inc. and the project's applicant and developer, FHK Companies, Inc. (FHK), are real parties in interest here).

On appeal, Anderson Coalition claims (1) the trial court's judgment violated CEQA by severing a CEQA-deficient gas station from the project, allowing the rest of the project to proceed; (2) the environmental impact report (EIR) inadequately evaluated urban decay, traffic, and hydrology impacts; and (3) the project is inconsistent with City's general plan and City's zoning code. We reverse the judgment as to the project's fair-share mitigation fee for improvements to a freeway interchange, and specify certain requirements for this fee to be sufficient under CEQA; in all other respects, we affirm.

### BACKGROUND AND STANDARD OF REVIEW

In July 2003, City approved the Anderson Marketplace Project (the Project) after certifying the final EIR for it. The Project is adjacent to State Highway 273 and is about 600 feet west of Interstate 5 (I-5); it is situated in the quasi-rural southwest portion of the City adjoining present City development. The Project encompasses 26 and a half acres; it is comprised of an approximately 184,000 square-foot Wal-Mart Supercenter, three other commercial-retail pads totaling 21,700 square feet, and a size-unspecified 12-position gas station. (Supercenters generally operate 24 hours per day and combine a full Wal-Mart merchandise discount store with a full supermarket.) Land use approvals necessary for the Project included a general plan amendment and rezone (to change eight of the acres from residential to highway commercial), a parcel map, and a conditional use permit.

Anderson Coalition petitioned for a writ of mandate, challenging City's approval of the Project on the environmental grounds noted above in the introduction. The trial court granted the petition to the extent that the traffic (vehicle trip-generating) impacts of the gas station, and consequently the station's air quality impacts, had not been analyzed in the EIR.

Pursuant to CEQA section 21168.9, the trial court, in the judgment, severed the gas station from the rest of the Project and ordered FHK and Wal-Mart to

suspend any gas station activity until they had complied with CEQA regarding the station's traffic and air quality effects. The trial court allowed the rest of the Project to proceed.

Thereafter, City excluded the gas station from the Project and adopted new resolutions approving the Project and certifying its EIR in this context.

In reviewing the CEQA issues on appeal, we determine, independently from the trial court, whether City prejudicially abused its discretion either by failing to comply with legal procedures or by making a decision unsupported by substantial evidence. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Citizens of Goleta Valley*); *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 911–912 [100 Cal.Rptr.2d 173].)

■ Here, we largely review the adequacy of an EIR. " ' "[T]he sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . ." [Citations.] Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure. [Citations.]' [Citations.]" "A prejudicial abuse of discretion occurs ' "if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." [Citation.]' " (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1355 [111 Cal.Rptr.2d 598] (*Berkeley Jets*).) "Thus, [a] reviewing court ' "does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." ' " (*Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 564.) The substantial evidence standard—i.e., enough relevant information and reasonable inferences to support a conclusion, even if other conclusions might also be reached—is applied in reviewing factually based findings, conclusions and determinations. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198 [22 Cal.Rptr.3d 203] (*Bakersfield Citizens*); tit. 14, Cal. Code Regs., § 15384, subd. (a.).)[1] (We will set forth the standard of review regarding the planning and zoning consistency issues in our discussion of them.)

Discussion

### 1. *The Trial Court Judgment Severing the Gas Station*

Anderson Coalition contends the trial court's judgment violated CEQA by severing the gas station from the Project, allowing the rest of the Project to

---

[1] Section 15000 et seq. of title 14 of the California Code of Regulations shall hereafter be referred to as the Guidelines.

proceed. The environmental impacts at issue here are the gas station's traffic and air quality impacts stemming from the number of vehicle trips the station would generate. We conclude the trial court did not err.

In various documents in the EIR process, the Project was described as a commercial project consisting of a nearly 184,000 square-foot building for Wal-Mart, three other commercial pad sites totaling 21,700 square feet, and a fourth pad for a 12-position gas station. (The 184,000 figure did vary in some of the documents, but only in trivial respects.) The sizes of the gas station and the fourth pad were never specified. The total square footage for the Project was described on several occasions as a little over 205,000 square feet, a figure which did not encompass the gas station.

City attempted to explain that the EIR had evaluated the gas station's traffic and air quality impacts (based on trip generation) pursuant to a standard trip-generation manual. Under the manual, the gas station was considered a shopping center "outparcel" (i.e., a smaller, detached commercial parcel that is nevertheless part of a larger shopping center complex). However, the record showed that this manual's example-based definition of "outparcel" did not include gas stations, and that the "outparcel" definition was drafted prior to the recent phenomenon of gas stations being developed as an integral part of shopping centers themselves.

Based on all of this, the trial court granted Anderson Coalition's petition on the point that the traffic and air quality impacts of the gas station had not been analyzed in the EIR. The court reasoned that, given the total square footage described for the Project, it was not clear whether the gas station had been considered in the traffic and air quality analyses in the EIR for the Project; and City's claim that the gas station had been analyzed as a shopping center "outparcel" was not supported by substantial evidence.

Pursuant to CEQA section 21168.9, the trial court fashioned the following remedy in its judgment: the construction and operation of all aspects of the Project could proceed, except for the gas station; and activity regarding the gas station was suspended pending CEQA compliance regarding its traffic and air quality effects.

Under the dictates of subdivision (b) of section 21168.9 of CEQA, the trial court made the following findings in the judgment: "(1) the infirmities in the EIR are limited solely to the potential traffic and air quality impacts associated with the proposed gas station; (2) the construction and operation of the gas station are specific 'project activities' that are severable from the remainder of the Project; (3) severance of the gas station from the remainder of the project will not prejudice complete and full compliance with CEQA, in that

the only defects in the EIR . . . relate to the operation of the proposed gas station to be located on the Project site, and the remainder of the Project can be developed and operated without the gas station, and thus without the potential traffic and air quality effects that might result from gas station operation; and (4) the court has found the remainder of the Project to be in full compliance with CEQA." We conclude the trial court acted properly.

CEQA Section 21168.9 states as pertinent:

"(a) If a court finds . . . that any determination, finding, or decision of a public agency has been made without compliance with [CEQA], the court shall enter an order that includes one or more of the following:

"(1) A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part. [¶] . . . [¶]

"(b) Any order pursuant to subdivision (a) shall include only those mandates which are necessary to achieve compliance with [CEQA] and only those specific project activities in noncompliance with [CEQA]. The order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with [CEQA]. However, the order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with [CEQA], and (3) the court has not found the remainder of the project to be in noncompliance with [CEQA]."

Anderson Coalition argues that the trial court erred in its severance remedy by allowing the Project to proceed after finding two significant defects in the EIR; contrary to CEQA's basic purpose, this approach improperly segregated project approval from environmental impact evaluation. The two significant defects, Anderson Coalition maintains, are the elusive and inadequate project descriptions regarding the Project's total size, and the inadequate traffic and air quality analyses for the entire project.

Anderson Coalition's argument fails in light of what we have said above. The record regarding the Project's total size and its traffic and air quality analyses shows that these two alleged defects relate only to the EIR's failure to consider the proposed gas station; these defects do not concern the whole project. The EIR's descriptions of the Project's total size show only that the gas station may have been omitted from the Project's environmental analysis. And the EIR's analysis of the Project's traffic and air quality impacts was not inadequate regarding the *entire* project, but only regarding the gas station,

which the trial court found to have been omitted from the analysis. In this context, the trial court properly could, and did, sever the gas station from the rest of the Project under CEQA section 21168.9, subdivision (b).

■ Anderson Coalition claims that the severance remedy under CEQA section 21168.9 was originally designed to address only relatively minor matters of noncompliance with CEQA, not the more significant aspects involved here. But as the court recognized in *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (2001) 89 Cal.App.4th 1097 [109 Cal.Rptr.2d 108], "[t]he 1993 amendments to section 21168.9 expanded the trial court's authority and 'expressly authorized the court to fashion a remedy that permits some part of the project to go forward while an agency seeks to remedy its CEQA violations. In other words, the issuance of a writ need not always halt all work on a project.' " (89 Cal.App.4th at pp. 1104–1105, quoting Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 647.)

Two decisions which have found the CEQA section 21168.9 severance remedy inapplicable stand in contrast to the situation here and support our resolution: *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713 [32 Cal.Rptr.2d 704] (*San Joaquin Raptor*) and *Bakersfield Citizens, supra,* 124 Cal.App.4th 1184. In *San Joaquin Raptor*, the court described the EIR as a "mass of flaws" from beginning to end and "in all major respects." (27 Cal.App.4th at pp. 741–742 & fn. 13 ["the vast array of inadequacies in the [EIR] precludes severance"].) *Bakersfield Citizens* aptly noted that "[n]o discrete or severable aspects of the projects are unaffected by the omitted analyses; the defects relate to the shopping centers in their entirety, not just to one specific retailer." (124 Cal.App.4th at p. 1221.)

Anderson Coalition also argues that "separation of the gas station from the remainder of the Project improperly curtails environmental analysis and hinders a good faith assessment of cumulative impacts." Not so. The Project no longer includes the gas station. And no free passes from environmental review have been issued. Should the gas station ever be proposed again, it will have to be environmentally reviewed as to its own impacts and together with the Project as to its cumulative impacts. (See *San Joaquin Raptor, supra,* 27 Cal.App.4th at pp. 729–730, 733 [lead agency cannot divide up a project and overlook its cumulative impact by separately focusing on the divided parts].)

Finally, City and Wal-Mart claim the trial court erred in finding the EIR deficient regarding the gas station's traffic and air quality impacts. We deem the claim forfeited because City and Wal-Mart have not cross-appealed on

this point. (See *Weiss v. Brentwood Sav. & Loan Assn.* (1970) 4 Cal.App.3d 738, 746 [84 Cal.Rptr. 736].)

### 2. *Urban Decay*

Anderson Coalition next claims the EIR did not properly evaluate the Project's potential to cause urban decay. We disagree.

The Coalition raises two points.

First, the Coalition claims City took the legally erroneous position that urban decay impacts are economic impacts outside CEQA's scope, and that since City's downtown was already partially blighted it was unnecessary to evaluate whether urban decay is likely to result from the Project's addition of over 200,000 square feet of new retail. In other words, Anderson Coalition argues that City bypassed addressing the issue of urban decay impact on legal grounds.

██ An EIR is to disclose and analyze the direct and the reasonably foreseeable indirect *environmental* impacts of a proposed project if they are significant. (Guidelines, §§ 15126.2, 15064, subd. (d)(3).) Economic and social impacts of proposed projects, therefore, are outside CEQA's purview. When there is evidence, however, that economic and social effects caused by a project, such as a shopping center, could result in a reasonably foreseeable indirect environmental impact, such as urban decay or deterioration, then the CEQA lead agency is obligated to assess this indirect environmental impact. (*Bakersfield Citizens, supra,* 124 Cal.App.4th at pp. 1205–1207; *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1019–1021 [100 Cal.Rptr.2d 413] (*Friends of Davis*); *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 445–446 [243 Cal.Rptr. 727]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 169–171 [217 Cal.Rptr. 893].) An impact "which is speculative or unlikely to occur is not reasonably foreseeable." (Guidelines, § 15064, subd. (d)(3).)

In the EIR for the Project, City adhered to these legal principles regarding the Central Business District (CBD or downtown). On the economic point, City substantively considered the issue of whether economic and social changes wrought by the Project could result in a significant indirect environmental impact of urban decay or deterioration on the downtown, and concluded no. On the blight point, City again considered the matter substantively, concluding there was no evidence suggesting that City's CBD would suffer from "*additional* physical blight or a significant deterioration of character" as a result of the Project. (Italics added.)

As for its second point, Anderson Coalition claims the evidence is insufficient to sustain City's conclusion in the EIR that the impact of urban decay on the CBD is less than significant. We disagree. In this context, we do not review the record, as the Coalition wishes us to do, to determine whether it demonstrates a possibility of environmental impact; we review it in the light most favorable to City's conclusion to determine whether substantial evidence supports the conclusion that the impact of urban decay is less than significant. (See *Bakersfield Citizens, supra,* 124 Cal.App.4th at pp. 1207–1208; *Friends of Davis, supra,* 83 Cal.App.4th at p. 1021.) In the CEQA context, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)

The EIR concluded that the Project would not result in additional physical deterioration of City's CBD (i.e., downtown), and therefore this impact was less than significant. Three reasons were given for this conclusion.

First, City relied on an economic analysis which discussed the Project's impacts on other businesses, including the downtown area. City's downtown typically contains smaller retail stores that service local residents. The Project, by contrast, is designed to serve a regional market and compete against other big-box retailers in Redding and Red Bluff. Although some competition would be expected between the Project and existing businesses in the City, the Project is more likely to compete directly with City's existing outlying (satellite) shopping areas rather than its CBD. Because of the City's proximity to Redding and Red Bluff's big-box retailers, the City loses significant shopping and tax dollars to these two cities from its own residents (general studies show an approximate 25 percent "leakage"). The Project could stem this leakage by keeping the City's residents shopping in the City; this could create more potential customers for goods and services within the CBD. One study cited by Anderson Coalition shows that stores that do not compete directly with Wal-Mart tend to show an increase in sales due to increased local traffic.

Second, prior to the Project application, City had created a redevelopment district to address the issue of existing blight within the CBD. The CBD and the proposed site for the Project (or at least one-half the site) are in this district. Construction on vacant land within the Redevelopment District, according to the EIR, results in significant increases in property value and property taxes that City can use to make improvements throughout the District. By generating these tax increment moneys, the Project will contribute funds to revitalize the CBD. According to the EIR, City's Redevelopment Agency projects "that $1 million in net present value of future redevelopment

property tax increment will be used for public improvements in the Central Business District, and [$1.375 million] will be used for commercial and industrial development business assistance. The business assistance programs are most likely to be primarily utilized within the Central Business District. In addition, a net present value of [$4 million] is anticipated to be used to correct infrastructure deficiencies. Again, a significant amount of these funds are likely to be allocated to infrastructure improvements within the Central Business District area. In fact, the first such infrastructure improvement project . . . is budgeted for improvements . . . within the Central Business District."

And third, according to the EIR, the viability of the CBD area is more likely to be affected by planning efforts and marketing strategies, infrastructure improvement projects, appropriate building preservation, and incentives to business owners to locate (and stay) in the CBD.

Anderson Coalition submitted a study of the Project's likely potential to cause urban decay in City's CBD (the King Report), along with similar studies from other communities (Shils Report, Stone [Mississippi] Report, Rea & Parker, Impact of Wal-Mart on Downtowns), and public testimony. The King Report concluded "that the proposed Super Center would drive customers out of [City's] downtown area creating blight." (Boldface omitted.) That report went on to name the downtown businesses that would be severely impacted by the Wal-Mart Supercenter; these comprised two pharmacies, one florist, one hardware store, two furniture stores and a craft store. The studies from other communities presented a mixed bag. As the Stone Report noted, for example, "[s]ome downtown businesses in cities where WalMarts have located have benefited from the greater draw of customers. Others have been devastated by the overwhelming new competition for their customers' dollars." The Shils Report has recognized that the key survival strategy for local merchants is to specialize in unique products and service. Local merchants need to create niches, and draw from the increased traffic provided by the big-box retailers.

City addressed these studies submitted by Anderson Coalition. City conceded that the two downtown pharmacies identified in the King Report may be impacted by the Wal-Mart, but noted that the other named downtown businesses, not directly competing with Wal-Mart, may actually benefit from increased local retail traffic. City also pointed to the sales "leakage" factor noted in these studies for communities without large retail projects, and the " 'synergy' " that may be created between a new Wal-Mart and local businesses that provide goods not offered by Wal-Mart. These studies did not persuade City that the *economic* effects of the Project will foreseeably result in significant *environmental* effects.

A good argument can be made that the King Report, focusing as it does on the City, along with the studies from other communities and the public comments, present substantial evidence that the Project could add to the blight in City's CBD. But a good argument can also be made that City has presented substantial evidence that the Project will not do so. Anderson Coalition argues that the "type and magnitude of evidence [it presented on the issue of urban decay] parallels the evidence introduced in *Bakersfield Citizens*." But there is a big difference in the legal posture between the present case and *Bakersfield Citizens*. The *Bakersfield Citizens* court concluded that an EIR was deficient as an informational document because it *failed to consider* the potential of a Wal-Mart Supercenter project to cause urban decay notwithstanding a great deal of evidence of that potential. (*Bakersfield Citizens, supra,* 124 Cal.App.4th at pp. 1193, 1208–1212.) Here, as we have seen, City's EIR *did* consider the issue of the Project's impact on urban decay on the CBD, and concluded that the impact was less than significant. As noted, we review the record in the light most favorable to that conclusion. In doing so, we conclude that substantial evidence supports it.

Relying largely on the King Report, Anderson Coalition raises the additional issue that the Project could cause new decay in satellite shopping areas outside the CBD (downtown) and claims the EIR never addressed this concern. The King Report focused on City's downtown, but also opined that the Project would seriously impact existing shopping centers outside the CBD, creating blight; the report noted that City already has one blighted mall and two that are marginal.

Contrary to Anderson Coalition's claim, the final EIR *did* address this concern of outlying urban decay, stating: "The [draft EIR] does under Impact 4.2.2 note that some economic impact may occur in other commercial areas of the community [i.e., the shopping centers noted in the King Report outside the CBD]. However, while some vacancies may occur, in a growing community of Anderson, these vacancies may be filled by other uses not directly in competition with Wal-Mart. Consequently, it cannot be stated with any probability that any negative physical change may occur. Since economic effects are not to be treated as significant effects, no mitigation is necessary. . . . Notwithstanding [the King Report's] predictions of possible business closures, neither the commenter nor [the King Report] has met the evidentiary burden necessary to require the City to attempt to predict *physical* impacts that hypothetically might follow from such closures. Nor has the commenter provided any information suggesting that any such speculative physical impacts would rise to the level of *significant* environmental effects requiring analysis in an EIR. Such potential closures would occur in an urbanized area that, compared with currently undeveloped property, lacks any ecological values that might be compromised or harmed by the temporary or permanent vacancy of urban structures. Should businesses close and not be

replaced with new businesses, the purely environmental consequences might be benign: reduced traffic into the affected area. Should any closed businesses be replaced with new ones, it is likely that there would be little, if any, net environmental difference between the pre-closure and post-closure condition. Old traffic will be replaced by new traffic. . . . [¶] . . . It is only when economic competition demonstrably leads to adverse environmental effects that CEQA takes note . . . ."

Thus, City did not find evidence of economic and social effects caused by the Project that could result in a reasonably foreseeable impact of urban decay regarding outlying shopping centers. (*Bakersfield Citizens, supra,* 124 Cal.App.4th at p. 1207; *Friends of Davis, supra,* 83 Cal.App.4th at pp. 1019–1020.) City therefore did address this issue in the EIR. And substantial evidence supports City's conclusion that urban decay in this context is speculative, and therefore not reasonably foreseeable; consequently, City was not obligated to further analyze this claimed indirect impact. (*Bakersfield Citizens, supra,* 124 Cal.App.4th at p. 1207; *Friends of Davis, supra,* 83 Cal.App.4th at p. 1020; Guidelines, § 15064, subd. (d)(3).) The potential for urban decay in an older, denser urban area such as a central business district is greater than that presented in a newer, outlying, more isolated (satellite) shopping center. Furthermore, City could reason that since it found the Project's impact of urban decay to the CBD to be less than significant on the basis of substantial evidence, the lesser impact of urban decay to a diffuse, outlying shopping center was no greater than speculative. As a small, growing town with a population of around 9,500, City noted that its potential for urban decay is less than that of a typical, declining "rust-belt" city.

### 3. *Traffic*

Anderson Coalition contends the EIR improperly sets forth speculative traffic mitigation measures, and improperly segments environmental review of a freeway interchange improvement from the Project. We disagree for the most part, but find we must reverse the trial court's denial of the Coalition's petition regarding the Project's "fair-share" cumulative traffic mitigation fee regarding the interchange.

As for the speculative traffic mitigation measures, the Coalition argues the EIR erroneously assumed the uncertain (1) construction of Pleasant Hills Drive; (2) realignment of Rhonda Road; (3) extension of Deschutes Road; and (4) improvement of the I-5/Deschutes Road interchange (hereafter, I-5 interchange).

■ CEQA requires that feasible mitigation measures actually be implemented as a condition of development, and not merely be adopted and then

neglected or disregarded. (See *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1260–1261 [100 Cal.Rptr.2d 301] (*Federation of Hillside*).)

The EIR states that the Project cannot be developed without the construction of Pleasant Hills Drive on the Project's northern boundary and the realignment of Rhonda Road on the Project's eastern side. These two roads will intersect at a "T" just west of State Highway 273. As mitigation measures regarding this construction and realignment, the EIR specifies that the Project cannot proceed until the right-of-way or access to the roadway for Pleasant Hills Drive and Rhonda Road has been secured by City or to City's satisfaction, and the intersection of Rhonda Road and Pleasant Hills Drive has been set at least 350 feet west of State Highway 273. These are not speculative mitigation measures regarding the construction of Pleasant Hills Drive and the realignment of Rhonda Road; the Project cannot take place without them.

The extension of Deschutes Road and the improvement of the I-5 interchange are to meet cumulative traffic conditions for the year 2025 as the area develops. In light of the assumptions that Pleasant Hills Drive will be constructed, Rhonda Road realigned, Deschutes Road extended, and the I-5 interchange improved, the EIR concludes that the cumulative impacts of the Project on traffic conditions will be less than significant.

When future traffic congestion will result from the cumulative impact of several projects, cumulative traffic mitigation measures for a single project (that is one of the several projects) may be deemed sufficient if those measures are based on a reasonable plan of actual mitigation that the relevant agency commits itself to implementing. (See *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 363–364 [110 Cal.Rptr.2d 579] (*Napa Citizens*); *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 141 [104 Cal.Rptr.2d 326] (*Save Our Peninsula*); *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1029 [280 Cal.Rptr. 478] (*Sacramento Old City Assn.*); *Federation of Hillside, supra,* 83 Cal.App.4th at pp. 1261–1262.) As we shall explain, with respect to the cumulative-related Deschutes extension here, City has satisfied this test regarding the Project.

In an addendum to a City staff report, City consultants noted that future commercial development on the Westlake property just north of the Wal-Mart store is likely, especially over a 20-year period of time, and therefore the Deschutes Road extension (to serve that and other future development, together with the Project) was included in the year 2025 conditions. In the final EIR, City noted: the extension of Deschutes Road (also known as

Factory Outlets Drive) is identified in the Westlake commercial subdivision map adjacent to the north of the Project; City has identified the need for this extension and has conducted two traffic studies dependent upon it; and City will require the extension as a condition of further development in the area. In the subsequent City staff report (referred to *ante*), City additionally noted that a subdivision agreement ensuring construction of this extension has been included as condition 12 to the conditional use permit and condition 4 to the tentative parcel map for the Westlake development. This satisfies the sufficiency test for cumulative traffic mitigation measures related to a single project: the measures are based on a reasonable plan of actual mitigation that the relevant agency has committed itself to implementing.

That leaves the I-5 interchange, also identified in the EIR as a cumulative-related (year 2025) traffic impact. As a mitigation measure for the Project's contribution to this impact, City has imposed on the Project a "fair share" mitigation fee to pay for improvements to the interchange. City has estimated the cost of cumulative-based improvements for the I-5 interchange at approximately $4.9 million, with approximately $3.9 million attributable to "Phase I" of the improvement. Based on the Project's estimated trips, the mitigation measure specifies that the Project must pay 16.87 percent of the Phase I cost, or $611,214 (based on construction costs as of July 1, 2003).

A single project's contribution to a cumulative impact is deemed less than significant if the project is required to implement or fund its "fair share" of a mitigation measure designed to alleviate the cumulative impact. (Guidelines, § 15130, subd. (a)(3).) Fee-based mitigation programs for cumulative traffic impacts—based on fair-share infrastructure contributions by individual projects—have been found to be adequate mitigation measures under CEQA. (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 140.) To be adequate, these mitigation fees, in line with the principle discussed above, must be part of a reasonable plan of actual mitigation that the relevant agency commits itself to implementing. (*Id.* at pp. 140–141.)

Here, there is no serious dispute regarding the current cost estimates for the improvements to the I-5 interchange or the Project's fair-share percentage contribution to those improvements. However, the Project's 16.87 percent of the estimated Phase I cost of $3.9 million for the improvements is $657,930, rather than the $611,214 fee specified in the mitigation measure.

Furthermore, the mitigation measure specifies as pertinent that the Project will pay "the impact fee . . . $611,214 to [City] to participate in the program to provide improvements at the interchange at . . . Deschutes and Interstate 5." The mitigation measure is vague regarding "the program to provide [those] improvements"; in staff reports, City states it is preparing an update to

the traffic impact fee program to include the I-5 interchange improvements, and notes that "Condition 16 requires payment of the impact fee."

■ To be sufficient under CEQA, this fair-share mitigation fee measure must (1) specify an amount of $657,930 (which is currently based on July 2003 construction costs), and note the amount is for Phase I only; (2) specify that the Project will also pay 16.87 percent of the remaining reasonable costs of the improvements; and (3) make these fees part of a reasonable, enforceable plan or program that is sufficiently tied to the actual mitigation of the traffic impacts at issue (we realize City does not have total control over the improvements to the I-5 interchange; Caltrans has an important part to play as well). (See *Federation of Hillside, supra,* 83 Cal.App.4th at pp. 1260–1261, citing CEQA §§ 21081, 21081.6, subds. (a), (b); Guidelines, § 15091, subd. (b) [as relevant here, CEQA requires a lead agency to find, based on substantial evidence, that the mitigation measures are " 'required in, or incorporated into, the project' "; the agency " 'shall [also] provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures,' " and the agency must adopt a monitoring program to ensure that the mitigation measures are implemented] (*Federation of Hillside, supra,* 83 Cal.App.4th at pp. 1260–1261).)

The trial court denied the Coalition's petition for writ of mandate on the issue of whether the assumed improvements to the I-5 interchange (encompassing here the Project's fair-share contribution toward those improvements) were too speculative to be deemed an adequate mitigation measure for this cumulative impact. The trial court reasoned that substantial evidence supported the EIR's conclusion that the Project's cumulative impacts on traffic would be less than significant; therefore, the court did not have to consider whether the Project's fair-share mitigation fee for the I-5 improvements was an appropriate or reasonable mitigation measure, as there was no significant cumulative impact to mitigate.

The trial court erred in this respect, and we shall reverse the judgment on this point. As noted, the EIR concluded that the Project's cumulative impacts on traffic would be less than significant *because it assumed, among other things, that the I-5 interchange would be improved*; the mitigation fee is the Project's fair-share contribution toward that improvement. Therefore, we have had to consider the Coalition's claim that the I-5 interchange improvements and the Project's fair-share mitigation fee toward those improvements were too speculative to be considered adequate mitigation measures.

Anderson Coalition raises an additional contention. The Coalition claims that City failed to analyze the environmental impact of the I-5 interchange

improvements as part of the Project, thereby improperly segmenting environmental review of the Project in piecemeal fashion; that, pursuant to *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*), the I-5 interchange improvements should have been considered. We disagree.

 In *Laurel Heights*, our state high court concluded that the EIR for a university research facility did not assess the project's reasonably foreseeable impacts (resulting from the future expanded use of the facility), thereby improperly segmenting the project's environmental review. At the time of the EIR process, the University knew it would be significantly expanding the use of the research facility in the immediate future, knew exactly how many square feet the expansion would be, and had a clear idea of what the expanded facility would do. (*Laurel Heights, supra,* 47 Cal.3d at pp. 393–398; see also *Sacramento Old City Assn., supra,* 229 Cal.App.3d at pp. 1023, 1025–1026.) The *Laurel Heights* court held that an EIR must analyze the environmental effects of future action if that action is a reasonably foreseeable consequence of the initial project and if it will likely change the scope or nature of the initial project. (*Laurel Heights, supra,* 47 Cal.3d at p. 396.)

The I-5 interchange improvements are not akin to the research facility expansion in *Laurel Heights*—the improvements are not as definitive and specific, and they are tethered to a longer timeline. Furthermore, the interchange improvements are based on the cumulative impact of several projects, and not just the project at issue. The interchange improvements will not likely change the scope or nature of the Project. The Project will already be in place, and when the surrounding area is developed more, the interchange improvements will service the area including the Project. Of course, the interchange improvements will be subject to environmental review at some point. (See *Laurel Heights, supra,* 47 Cal.3d at p. 396.) Consequently, we find that City did not improperly segment environmental review of the I-5 interchange improvements from the Project.

4. *Hydrology*

Anderson Coalition raises three points on the subject of hydrology.

First, the Coalition claims the EIR did not provide sufficient information to determine whether a proposed storm water detention basin was technically sound (the detention basin is to ensure that postdevelopment storm water runoff from the Project site does not exceed predevelopment levels); the EIR omitted information regarding rainfall rates, hydraulic routing, and other drainage data.

The detention basin was analyzed in the "Preliminary Drainage Report" for the Project, which was included in the EIR as an appendix. This drainage report was based on a more general (nonproject) prior study, the "Anderson Drainage Study," which was referred to in the EIR but not included or incorporated therein. The Anderson Drainage Study contains all the information that the Coalition maintains should have been included in the EIR.

 The Preliminary Drainage Report summarizes the pertinent technical hydraulic and drainage information to determine the adequacy of the storm water detention basin for the Project. (As a mitigation measure, the EIR requires the detention basin to ensure that postdevelopment storm runoff not exceed predevelopment storm runoff even in the face of 10, 25, and 100-year storm events.) Highly technical and specialized analyses and data for a project are to be included in appendices to the EIR, as was done here with this drainage report. (Guidelines, § 15147.) When an EIR relies on technical information from an outside source, such as the Anderson Drainage Study here, the EIR should cite to that source (page and section number, where possible) but need not include it. (Guidelines, § 15148.) The EIR could have referred more specifically to the Anderson Drainage Study, but the EIR's more casual references do not invalidate the EIR.

Second, the Coalition notes that its expert and the Anderson-Cottonwood Irrigation District (ACID) expressed concerns about water quality and quantity regarding the Project's drainage runoff into ACID's main canal. ACID acknowledged that these concerns had been resolved through a series of adopted mitigation measures that would minimize the impacts. Also, pursuant to ACID's impetus, City is not to issue grading or building permits for the Project until ACID approves the plans and verifies that the predevelopment conditions are not exceeded. One of ACID's concerns had been the impact of the proposed gas station on water quality, but the station is no longer part of the Project.

Finally, the Coalition asserts that City failed to respond to the Coalition's expert's recommendation that the quality of storm water runoff to the irrigation water supply be monitored after the Project is developed. In approving the Project, however, City adopted a mitigation monitoring program. This program requires the monitoring of the water quality mitigation measures that ACID deemed adequate to address its water quality concerns; those concerns are focused on the irrigation water supply.

### 5. *Consistency with General Plan and Zoning Code*

Anderson Coalition claims the Project is inconsistent with City's general plan in two respects. These claims are based on the Planning and Zoning Law

(Gov. Code, § 65000 et seq.) rather than CEQA. (See *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 707 [7 Cal.Rptr.3d 868] (*Santa Teresa*).)

█ When we review an agency's decision for consistency with its *own* general plan, we naturally accord great deference to the authoring agency's determination. (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 142.) The agency has broad discretion, especially regarding general plan policies, which reflect competing interests. (*Ibid.*) "A reviewing court's role 'is simply to decide whether the [agency] officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' " (*Ibid.*, quoting *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719–720 [29 Cal.Rptr.2d 182] (*Sequoyah Hills*).) If the agency's decision is not arbitrary, capricious, unsupported, or procedurally unfair, it is upheld. (*Santa Teresa, supra,* 114 Cal.App.4th at p. 707.)

First, the Coalition claims the Project is inconsistent with policy J of the land use element of City's general plan, which states: "[City's] Central Business District [CBD] should be the center of activity in the community." Coalition argues the Project (1) is not in the CBD, but on the outskirts of town; (2) is designed to serve 40,000 people when City's population is just over 9,000; and (3) will dilute activity in the CBD.

In the EIR, City discussed policy J and concluded that the Project was consistent with it. City noted that the Project was a regional-serving retail development that would not fit within the CBD, literally or figuratively. Drawing from what it had to say regarding urban decay, City noted in the EIR that the CBD encompassed smaller retailers who serve primarily the local community and who may benefit from an increase in shopping traffic that now travels out of town. Moreover, the CBD and much of the Project are in the City's redevelopment district, and the increased tax dollars from the Project will provide funding to improve the CBD. These aspects, City concluded, will enhance CBD activity and alleviate existing blight. We cannot say City's consistency determination regarding policy J is arbitrary, capricious, unsupported or procedurally unfair.

The Coalition's second claim of general plan inconsistency concerns the following nebulous statement buried in a narrative portion of the general plan: "The amount of land placed in the commercial categories must be kept in scale with the needs of the community. Too much commercial can be as detrimental as not enough." The Coalition claims that commercial acreage has significantly outpaced population growth.

City found that the Project is consistent with the policies of the land use element of the general plan pertaining to commercial uses. City based this

finding on the following: the development of regional-serving retail use is consistent with City's long-term plans as evidenced by the existing land use designation and zone district for the Project site and surrounding vacant property; the Project is located in an area in which City has encouraged and planned for commercial growth (South Anderson); and the Project will encourage residential growth in its vicinity.

Coalition counters that these general rationalizations do not answer the major question posed by the land use element of the general plan: "Does the [Project] cause too much commercial property in [City?]" The problem with this argument is that the language in the land use element Coalition relies upon—that the amount of commercial land must be kept in scale with community needs, and too much can be as detrimental as not enough—is itself a generalized statement; in fact, the next sentence of that statement reads: "A precise amount of acres needed for commercial, however, is difficult to calculate."

Again, then, City considered the applicable "policy" regarding the amount of commercial land and did so in a reasoned, supported way. That's as far as we can take our inquiry. (See *Sequoyah Hills, supra,* 23 Cal.App.4th at p. 719 [in considering general plan consistency, "[i]t is, emphatically, *not* the role of the courts to micromanage these . . . decisions"].)

That leaves as our final consideration the Coalition's claim that City unreasonably interpreted its own zoning code. Similar to an agency's interpretation of its own general plan, "an agency's view of the meaning and scope of its own [zoning] ordinance is entitled to great weight unless it is clearly erroneous or unauthorized." (*Friends of Davis, supra,* 83 Cal.App.4th at p. 1015.)

Here, City determined that the Project is allowed in the Highway Commercial District (C-2) zone. City's zoning code section 17.20.030, subdivision K, governs that zone and states: "Uses permitted subject to first obtaining a use permit . . . are as follows: [¶] . . . [¶] K. Commercial development of over twenty thousand square feet of gross floor area (except hotels and motels)." City required the Project to obtain a use permit here. We cannot say that City's interpretation of this zoning code section is clearly erroneous or unauthorized.

### DISPOSITION

We reverse the judgment to the extent it denied the Coalition's petition for writ of mandate on the issue of whether the assumed improvements to the I-5 interchange (encompassing here the Project's fair-share contribution toward

those improvements) were too speculative to be deemed an adequate mitigation measure for this cumulative impact, and we remand this matter to the trial court to grant the petition in this respect. To be sufficient under CEQA, this fair-share mitigation fee measure must (1) specify an amount of $657,930 (which is currently based on July 2003 construction costs), and note the amount is for Phase I of the improvements only; (2) specify that the Project will also pay 16.87 percent of the remaining reasonable costs of the improvements; and (3) make these fees part of a reasonable, enforceable plan or program that is sufficiently tied to the actual mitigation of the traffic impacts at issue. In all other respects, the judgment is affirmed. The Coalition is awarded its costs on appeal.

Butz, J., and Cantil-Sakauye, J., concurred.