Filed 3/9/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PRESERVE POWAY, | D066635 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2013-00067667-CU-TT-CTL) |
| CITY OF POWAY, | |
| Defendant and Appellant; | |
| HARRY A. ROGERS et al., | |
| Real Parties in Interest and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald S. Prager, Judge. Judgment reversed in part with directions. Motion to strike granted.

McDougal, Love, Eckis, Boehmer & Foley, Morgan L. Foley and Casey C. Shaw for Defendant and Appellant City of Poway.

Byron & Edwards, Michael M. Edwards and Robert Scott Norman for Real Parties in Interest and Appellants Harry Rogers, John F. Trochta, Shirley R. Trochta, and John Fitch and Associates.

The Law Office of Julie M. Hamilton, Julie M. Hamilton and Leslie Gaunt for Plaintiff and Respondent.

The City of Poway (Poway) calls itself the "City in the Country."  For 20 years, Harry Rogers has been operating a horse boarding facility called the Stock Farm in Poway.  Rogers now wants to close down the Stock Farm and build 12 homes in its place (the Project).  Most of the homes will be on one-acre lots, with enough room for horses, a legally permissible use under existing zoning.  Of course, people who currently board horses at the Stock Farm will have to find someplace else.  Having the Stock Farm close down particularly concerns members of the Poway Valley Riders Association (PVRA), whose 12-acre rodeo, polo, and other grounds are *across the street* from the Stock Farm.

Over the objections of the PVRA and others, Poway's city council voted unanimously to approve the Project under a mitigated negative declaration (MND).  Subsequently, project opponents formed Preserve Poway (Preserve) and instituted this litigation, asserting the California Environmental Quality Act (CEQA) required an environmental impact report (EIR) to be prepared instead of an MND.

The superior court ruled an EIR was necessary because there was substantial evidence that the Project's elimination of the Stock Farm may have a significant impact on Poway's horse-friendly "community character" as the "City in the Country."

Unlike some CEQA cases, there is no evidence the Project violates zoning or any other land use regulations.  There is also no evidence the Project will have any adverse impact on traffic, noise, or air pollution.  No one contends the Project is an eyesore.  The homes have not even been designed yet.  There is no substantial evidence the Project, as

2

mitigated, will cause erosion or drainage problems. There is no substantial evidence of any adverse unmitigated ecological effect. In fact, even if the Stock Farm closes and the homes are built, there will not be any reduction in Poway's horse population. The Stock Farm stables about 100 horses now. If the Project is built, about 90 horses could be kept on the privately owned lots.

The real issue in this case is not what is proposed to be going *in* (homes with private horse boarding), but what is coming *out* (the Stock Farm, public horse boarding). Project opponents essentially contend that because Rogers, a private property owner, obtained a conditional use permit to operate horse stables they have enjoyed using for 20 years, the public has a right *under CEQA* to prevent Rogers from making some other lawful use of his land.

As we explain, there is substantial evidence the loss of the Stock Farm's public horse boarding facilities may impact Poway residents. As one Project opponent explained, "We need to keep the stables . . . to enable any young people to continue to be able to ride. It gives them something wholesome and positive to do, instead of sitting in front of a computer or video game, or getting into trouble." Another resident explained that boarding his horse at the Stock Farm taught his daughter "valuable life lessons, kept her out of trouble, allowed her to excel in school and life, [and] brought our family closer together." Several residents voiced concerns that closing the Stock Farm would damage Poway's identity as the "City in the Country."

As these quotations demonstrate, the impacts of closing the Stock Farm and building homes in its place are psychological and social— not environmental. CEQA

3

does not apply to such impacts. "Economic or social effects of a project shall not be treated as significant effects on the environment." (Cal. Code Regs., tit. 14, § 15131, subd. (a).) "CEQA addresses physical changes in the environment, and under CEQA 'economic and social changes resulting from a project shall not be treated as significant effects on the environment.'" (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1019 (*Friends of Davis*).)

Whether the Project should be approved is a political and policy decision entrusted to Poway's elected officials. It is not an environmental issue for courts under CEQA. Therefore, we reverse the portions of the judgment regarding community character.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Project Site*

The Project consists of 11.6 acres on the east side of Tierra Bonita Road, approximately 400 feet south of Twin Peaks Road in Poway. The site is owned by Rogers and John and Shirley Trochta (collectively, Rogers), who were represented in the permitting process by John Fitch and Associates.

Currently, the site consists of four lots with two single-family homes and the Stock Farm. The Stock Farm is an equestrian boarding and training facility that Poway's city council approved in 1996 under a conditional use permit.

The Stock Farm has not always enjoyed the level of community support it has received in these proceedings. Over the years, neighbors complained about the Stock Farm's dust, stench from manure piles, stagnant water, unpermitted construction, and drainage problems.

4

Nearly all of the site is located within either the floodway or the flood plain of Rattlesnake Creek, which traverses the northerly portion of the site in an east/west direction. There is significant residential development north of the Project site. To the south is a cemetery and rural land.[1]

Located across the street and west of the Stock Farm are the PVRA grounds, an equestrian facility featuring events such as rodeos, horse shows, jousting and polo competitions. Many PVRA members board their horses at the Stock Farm. In the past, PVRA has considered applying for a conditional use permit to board horses on the PVRA grounds, but has declined to do so because the Stock Farm was readily available and the PVRA did not "want to deal with the liability and the work that's involved in . . . boarding horses."[2]

The Project will subdivide the property into 12 lots. Rattlesnake Creek will be channeled for flood control. No homes would be built in the floodplain or floodway.

Eight of the proposed lots are zoned rural residential, with minimum lot sizes of one acre. Four of the northern proposed lots are smaller, zoned residential single family

---

[1] Poway's brief characterizes the area as suburban; Preserve contends the area is rural. As explained in the text, neither label is entirely accurate.

[2] Preserve's brief describes PVRA's facility by quoting from PVRA's Web site and also cites to Dearborn Cemetery's Web site to describe the cemetery as "rural." Appellants have filed unopposed "[o]bjections" to such "evidence" on the grounds judicial review is limited to matters in the administrative record and appellate review is limited to the record that was before the trial court, neither of which contains these Web sites. We deem the objections to be a motion to strike the offending portions of Preserve's brief, which we grant. (*C.J.A. Corp. v. Trans-Action Financial Corp.* (2001) 86 Cal.App.4th 664, 673 [granting motion to strike portions of brief referring to evidence not in record].)

with minimum lot sizes of 10,000 square feet.  In addition to subdividing the property, the project includes grading, extending an existing sewer line, new curb and gutters, undergrounding existing utilities, new fire hydrants, a public trail, and flood channel improvements.

No new home construction is proposed at this time and any such new construction will be subject to additional reviews and city approval.  The development will be called "Poway Equestrian Estates," and owners will be allowed to board a maximum of nine horses per lot.  At a public hearing, Rogers explained the Project will result in no net loss of horses in the area:

> "It'd be the only equestrian facility development built, that I'm aware of, in the city of Poway. . . .  [¶] Under the current code in Poway, there will be a hundred horses allotted . . . to be in people's backyards on these properties. . . .  [¶] . . . So, the same amount of horses will be allowed to be there under our development as is what's boarded in my facility right now."

B. *Neighborhood Meeting*

In April 2013 Poway conducted a neighborhood meeting about the Project. Several attendees expressed concern about closing the Stock Farm.  "Those attendees indicated the reason they moved to, and live in Poway, is because of the equestrian lifestyle and that the closing of  . . . [the Stock Farm] would harm community character." In response, city staff  "indicated that continued operation of the facility . . . is a private property owner decision" and "the project is in compliance with all [c]ity standards and . . . no zone change is needed for the project."

6

A few days after the meeting, a resident sent the city an e-mail describing the impact of closing the Stock Farm on Poway's community character as the "City in the Country":

> "Like many Poway children, my daughter learned to ride horses at The Stock Farm and later boarded her horses there which enabled her to participate in many of the activities at the neighboring PVRA . . . . Her involvement in these activities taught her valuable life lessons, kept her out of trouble, allowed her to excel in school and life, [and] brought our family closer together . . . . Without The Stock Farm, none of this would have been possible. It worries me that future children and families won't have the same opportunity as ours did to participate in these wonderful activities. Poway is losing its 'City in the Country' feel and I believe that allowing this development would further contribute to that loss."[3]

C. *MND*

After completing an initial study, in August 2013 Poway prepared an MND for the Project. In the MND, Poway found the project would create significant environmental impacts on hydrology/water quality, biological resources, utilities and service systems, and cultural resources. However, Project revisions had been made or agreed to by the project proponents, and with such mitigation, Poway concluded there is no substantial evidence that the Project will have a significant effect on the environment. The initial study and MND found the Project would have no impact on aesthetics.

Copies of the MND and the initial study were sent to the State Clearinghouse (Clearinghouse), the division of the Governor's Office of Planning and Research

---

[3] Another who attended the neighborhood meeting sent an e-mail concerning fire safety and power poles.

7

responsible for coordinating the state-level review of environmental documents prepared under CEQA. The Clearinghouse sent copies of the report to 10 state and local agencies for comment, including the Department of Fish and Wildlife, the Air Resources Board, the Regional Water Quality Control Board, and the Native American Heritage Commission. No agencies opposed the Project.

D. *Public Hearing*

Poway conducted a public hearing in August 2013. Before the hearing, Poway received only three letters regarding the project. One was about flood control.

The second was an e-mail from PVRA, which PVRA sent less than an hour before the hearing. PVRA's e-mail stated it wanted to "register its objection in the strongest possible terms to the proposed housing development being considered for the Stock Farm." PVRA asserted, "a residential development is the last thing that should be allowed to be constructed across the street from one of Poway's greatest treasures—the PVRA grounds" because of the impact of PVRA's horse-related traffic on the proposed new homes:

> "Allowing housing to be built on the Stock Farm property across the street from a heavily used equestrian facility will create untold problems for the City and those residents who would move there. No residential development should be allowed where such traffic— horses, cars, trucks and trailers—exists."

PVRA also asserted that "hundreds of children and young adults" had stabled their horses at the Stock Farm, and those children "often join PVRA so they can improve their riding" and "participate in one or more of PVRA's numerous equestrian events." The e-mail called the Stock Farm "truly one of Poway's finest assets" and stated, "[i]f Poway is

8

serious about maintaining its City in the Country charm, it should retain this important property for equestrian use."  PVRA concluded, "Poway has plenty of houses but precious few horse boarding facilities, and none so centrally and strategically located."

The third letter (also an e-mail) urged the city to purchase the site and build a city horse park "instead of houses" to "save Poway's City in the Country."

During the public comment portion of the hearing, several Poway residents spoke in opposition to the Project.  Ann Tipps, a 27-year Poway resident, stated the Stock Farm had become "a long-standing community resource," providing "affordable boarding and easy access" to PVRA.  She noted "access of the stock farm to PVRA makes it possible for many horse owners to afford having horses."  Tipps was concerned that losing the Stock Farm "would probably . . . very much curtail the activities at PVRA.  It could ultimately result in withering of the [PVRA] and . . . loss of this club."  She also noted the convenience of the Stock Farm across the street from PVRA means "horse owners . . . have more time to enjoy their lives and spend time with their families and in the community . . . ."

William Koska, who "moved here from Los Angeles specifically because there were horses here," expressed concerns about (1) building homes "in a floodplain"; (2) leaking caskets from the cemetery south of the project site "could possibly contaminate the property"; (3) nitrates from horse urine that "may well have migrated into the groundwater supply"; and (4) the absence of an EIR.  He stated the property was "unique" because "it's across the street from PVRA."

9

Dee Fleischman was "really upset" there was no mechanism to have "redevelopment funds" to purchase the subject property, which she characterized as "an integral part of Poway." She predicted closing the Stock Farm would have a "major effect" on "activities for youth."

Kevin Hamilton characterized the area as "highly rural" and the "epitome of the city in the country." He thought there could be "a more attractive use of this 12-acre parcel" than "getting another dozen houses in . . . ."

Aletha Thomson was concerned about the Project's impact on "keeping the country in our city," stating:

> [T]he thing that concerns me the most is that when this city was founded, the founders of this city decided to come up with a motto of the city in the country. [¶] And I've watched over the years—I've been here since 1999. I've watched over the years and we're losing more and more country out of our city. So I would beg you to please consider keeping the country in our city. . . . [¶] . . . [¶] We love the city in the country. We love being here, where there is natural beauty. . . . [¶] And I really, truly believe that our city council should be upholding that mandate from the citizens of Poway to keep the country in the city . . . ."

Amber Shumann, a Poway high school student, boards her horse at the Stock Farm. She is also a PVRA member. In its appellate brief, Preserve states, "Nowhere is the impact on community character stated more clearly than in the testimony of high school sophomore Amber Shumann."

Shumann explained, "as many of us at the stock farm, we do not have horse property. And my family does not have a large . . . truck or horse trailer." She added, "our motto and we're known for, the city in the country. . . . [¶] . . . [¶] The country feel

10

is the personality and culture of Poway. . . . I would like Poway to remain the city in the country for years to come so that my children can one day enjoy the same wonderful experiences that I have had."

Two other speakers, Carolyn Zona and Elizabeth Guanuna, also expressed concern about losing Poway's "country character."

Responding to the Project opponents, John Fitch said the Project was "private property" that the owner had the right to develop consistently with existing zoning. He stated the PVRA could board horses on its own property, but had simply refused to do so:

> "They have the right to apply for a conditional use permit to board horses on that facility. They have chosen not to do that because they don't want to deal with the liability and the work that's involved . . . in boarding horses."

Harry Rogers also responded to the opposition. He explained the Project would be "the only equestrian facility development built, that I'm aware of, in the city of Poway." He also urged PVRA to board horses on its own facility:

> "PVRA keeps saying we're trying to get rid of horses, . . . that people are going to lose their places to board. PVRA has had numerous meetings . . . where they've brought up boarding. [¶] [T]hey have 12 acres there. We board currently—of actual housing of horses right now, we have 3.8 acres of our property is [*sic*] where we have horses boarded. PVRA has over 12 acres. Most of that land never gets used."

> "They're more than welcome to apply for a conditional use permit . . . . But once again, they have always said, we don't want the liability, we don't want the work."

> "But they're pushing it off on a private owner to do the same thing. So I don't believe my rights should be limited just because they don't want to board horses at . . . their location."

11

After public testimony concluded, Councilperson Cunningham said he had studied the Project "with unbelievable scrutiny." Cunningham noted, "[I]t is private property and the owner could cease operation tomorrow . . . . There is nothing that we either could or should do to try to compel somebody to stay in business if they don't choose to do so. [¶] . . . [¶] . . . [T]he fact of the matter is we have a proposed property use that's consistent with the zone, consistent with the requirements of our code." Cunningham said it was "ironic" that Rogers, by operating the Stock Farm for 20 years, had developed "sort of a landmark that the kids and families . . . are drawn to and see it as a symbol of Poway . . . ."

Cunningham said he was disappointed PVRA had chosen not to attend the public hearing, since if present, PVRA could have "answered Mr. Fitch's concerns and the applicant's concerns or comments as to the . . . reluctance to transfer the boarding facility to their property." Cunningham concluded by stating he had "studied every page of this report" and the project proponents had done "an amazing job . . . ."

Poway approved the tentative tract map and adopted the MND by a vote of four to zero, with one councilmember (Vaus) not voting because of disqualification.[4] Poway included 13 pages of conditions to the approval. These conditions included outside agency approvals for the proposed alterations and mitigation to the creek and flood channel improvements.

---

4    Vaus boards horses at the Stock Farm and was advised by the Fair Political Practices Commission he could not, therefore, participate in this vote.

E. *Litigation*

In September 2013 Preserve filed a petition for a writ of mandate against Poway, Rogers, and John Fitch and Associates. Preserve presented 10 distinct arguments in support of its petition: (1) inadequate notice to adopt the MND, (2) failure to adequately describe the Project in the MND, (3) fire hazard concerns, (4) inadequacy of the proposed wetland mitigation, (5) impact on community character, (6) the MND's inappropriate deferment of wetland mitigation, (7) the MND's inappropriate deferment of mitigating impacts to nesting birds, (8) safety concerns regarding improvements to Rattlesnake Creek floodway, (9) insufficient minimum lot size, and (10) failure to mitigate impacts from proposed tree removal.

Poway, Rogers, and John Fitch and Associates filed opposition addressing these issues. Following oral argument, the superior court issued an order finding that of the 10 issues raised by Preserve, only three were addressed at the administrative level: public safety, mitigation measures, and community character. The court determined that "[b]ecause the seven other issues raised in briefing by [Preserve] were not sufficiently raised at the administrative level, the Court has determined that they have been waived for litigation purposes."

The court denied the petition as to the public safety issue. The court also denied the petition's allegations the mitigation measures were inappropriate. However, the court granted the petition on the ground there was substantial evidence creating a fair argument that the Project would have a significant effect on Poway's community character. The court's order explains:

13

"[Preserve] presented letters . . . as well as testimony . . . to support their contention that the Project will have an adverse effect on community character. Notably, the letter from the PVRA states that the Project would be 'across the street from a heavily use equestrian facility' and that '[n]o residential development should be allowed where such traffic—horses, cars, trucks, and trailers—exists.' [Citation.] The fact that [Preserve] proffered evidence from at least three interested parties and more importantly, the PVRA, which presumably has an untold number of members, shows that the concerns raised by [Preserve] were not merely held by only a handful of people."

## DISCUSSION

### I. *ADMINISTRATIVE EXHAUSTION*

Preserve is an unincorporated association that did not exist until after the public hearing adopting the MND. The identity of its members is unclear; however, William Koska, who spoke at the public hearing, verified Preserve's writ petition as its president.

Public Resources Code[5] section 21177, subdivision (b) provides "[a] person shall not maintain an action or proceeding unless that person objected to the approval of the project orally or in writing . . . prior to the close of the public hearing on the project . . . ." Section 21177, subdivision (c) provides an exception to this rule, authorizing an organization formed after project approval to bring an action if a member of the organization properly objected to the project.

Appellants contend that under section 21177, subdivisions (b) and (c), Preserve may only raise in its writ petition issues addressed at the hearing by Koska himself and

---

5      All statutory references are to the Public Resources Code unless otherwise specified.

14

not those additional points raised by any other speaker. If appellants are correct, this would significantly narrow the issues because, unlike many other speakers at the hearing, Koska himself only obliquely referred to community character by noting the Stock Farm was across the street from PVRA's facilities.

Appellants' argument, however, is unavailing. The purpose of the administrative exhaustion requirement is to ensure the agency has been given the opportunity to respond to objections before there is litigation. Accordingly, a member of the group seeking judicial relief need not have *personally* raised the specific CEQA grounds being contested, so long as someone else presented the objections to the agency. "Thus, a party can litigate issues that were timely raised by others, but only if that party objected to the project approval on any ground during the public comment period or prior to the close of the public hearing on the project." (*Federation of Hillside and Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1263.)

Here, appellants concede that Koska objected to the Project at the hearing. Therefore, Koska individually, or as president of Preserve, may assert any objection to the MND raised by anyone else at the public hearing.

## II. *GENERAL PRINCIPLES OF CEQA*

CEQA requires that a public agency determine whether a project may have significant environmental impacts before it approves the project. (§ 21151, subd. (a); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 79, disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 575-576.) Under CEQA, an agency must require an EIR for any project that "may have a significant effect

15

on the environment," unless a categorical exemption applies.  (§ 21151, subd. (a); see §§ 21002.1, 21061, 21100; Cal. Code Regs., tit. 14, § 15000 et seq. (hereafter Guidelines), §§ 15080-15096, 15120-15132, 15160-15170, 15358, 15362, 15382.)[6]  An EIR is the "heart" of CEQA because it is the principal method for bringing information about the environmental impacts of a particular project to the attention of the agency and the public.  (*No Oil, Inc.,* at p. 84 .)

Where an agency determines that a project "would not have a significant effect on the environment," it must prepare a negative declaration, briefly describing the reasons for its determination.  (§ 21080, subd. (c); Guidelines, § 15371.)  Such a determination is appropriate only if "[t]here is no substantial evidence in light of the whole record before the [public] agency" that a significant environmental impact may occur as a result of the proposed project.  (§ 21080, subd. (c)(1); Guidelines, § 15070, subd. (a).)  A "significant effect" is a substantial, or potentially substantial, adverse change in the environment.  (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945.)

If there is substantial evidence that the project will have a significant environmental effect, but that effect may be reduced to a level of insignificance by implementing mitigation measures, the agency may adopt a mitigated negative declaration allowing the project to go forward subject to those measures.  (§§ 21064.5,

---

6    The California Office of Planning and Research adopted regulations for implementing CEQA.  Courts give these "Guidelines" great weight except when they are clearly unauthorized or erroneous.  (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 128, fn. 7.)

21080, subd. (c)(2); *Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1331-1332.)

### III. *THE "ENVIRONMENT"*

Under CEQA, the "environment" means "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.)

### IV. *SOCIAL AND ECONOMIC IMPACTS*

"CEQA addresses physical changes in the environment, and under CEQA 'economic and social changes resulting from a project shall not be treated as significant effects on the environment.'" (*Friends of Davis, supra,* 83 Cal.App.4th at p. 1019; Guidelines, §§ 15064, subd. (e); 15382.) "Economic and social changes resulting from a project are not treated as significant environmental effects [citation] and, thus, need not be mitigated or avoided under CEQA." (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1516.) "The focus of the analysis shall be on the physical changes." (Guidelines, § 15131. subd. (a).)[7]

---

7    However, "[e]conomic or social effects of a project may be used to determine the significance of physical changes caused by the project." (Guidelines, § 15131, subd. (b).) Additionally, economic or social changes that *cause* physical change must be analyzed in an EIR if the physical change is significant. An EIR may trace the effects of economic or social change resulting from a project to physical changes caused by the economic or social changes. (Guidelines, § 15131, subd. (b); see, e.g., *El Dorado Union High School Dist. v. City of Placerville* (1983) 144 Cal.App.3d 123 [while increased student enrollment and potential for overcrowding by itself is not implicated in CEQA, such effects are when they will lead to construction of new facilities] superseded by statute as stated in *Chawanakee Unified School Dist. v. County of Madera* (2011) 196 Cal.App.4th 1016, 1021-1022.)

17

## V. *THE STANDARD OF REVIEW*

In reviewing an agency's decision to adopt an MND, a court (whether at the trial or the appellate level) must determine whether there is substantial evidence in the record to support a "fair argument" that a proposed project may have a significant effect on the environment. (*Citizens for Responsible & Open Government v. City of Grand Terrace, supra,* 160 Cal.App.4th at p. 1331.) The fair argument standard creates a "low threshold" for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review. (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316-1317.)

Whether the evidence establishes a fair argument that a project may result in significant environmental impacts is a question of law. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.) Evidence supporting a fair argument may consist of facts, reasonable assumptions based on fact, or expert opinions supported by fact but not "argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment." (§ 21080, subd. (e)(2); Guidelines, § 15384, subds. (a), (b).)

If substantial evidence exists to support a fair argument that a significant environmental effect may result from the project, the agency is required to prepare an EIR, irrespective of whether there is other substantial evidence in the record to the contrary. (§ 21080, subd. (d); Guidelines, §§ 15063, subd. (b)(1), 15074, subds. (a), (b);

18

*Citizens for Responsible & Open Government v. City of Grand Terrace, supra,* 160 Cal.App.4th at p. 1331.)

### VI. *SOCIAL IMPACTS OF CLOSING THE STOCK FARM ON POWAY'S COMMUNITY CHARACTER ARE OUTSIDE CEQA'S SCOPE*

Community character is not defined in CEQA or in the Guidelines. To the extent published California cases have discussed community character in CEQA cases, it has been limited to *aesthetic* impacts. For example, in *Banker's Hill, Hillcrest, Parkwest Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249 (*Banker's Hill*), this Court determined whether a 14-story residential building would significantly affect the "community character" of the project site, which was adjacent to San Diego's Balboa Park. (*Id.* at p. 280.) Project opponents there argued a significant impact existed because the project "'would be the only building higher than four stories on the east side of [Sixth] Avenue between Elm and University.'" (*Ibid.*) We disagreed, stating, "This argument ignores the fact that the Del Prado, while one lot removed from Sixth Avenue, is substantially higher than four stories, and that the Project will be consistent with the community character already established . . . ." (*Ibid.*) Similarly, in *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572 (*Bowman*), the project opponents challenged the city's approval of an MND for a housing complex. They asserted the project was "out of character" with the community because it was "plain too big" and "too massive." (*Id.* at p. 587.)

19

To the extent "community character" involves aesthetics, CEQA requires it to be examined. This is because CEQA defines "environment" to include "objects of . . . aesthetic significance." (§ 21060.5.)

Accordingly, in addition to *Banker's Hill* and *Bowman*, other courts have also recognized that aesthetic issues are properly studied under CEQA, and include impacts on public and private views and on the historic character of the project site and surrounding area. (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 363, 374–375 [colorful school playground's aesthetic impacts on "historic character" of neighborhood]; *Pocket Protectors v. City of Sacramento, supra,* 124 Cal.App.4th at p. 937 [visual "tunneling" or "canyoning" effect of "long double rows of houses flanking a narrow private street"]; *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 485, 492 [condominium project's impacts on public and private ocean views]; *Ocean View Estates Homeowners Assn., Inc. v. Monetcito Water Dist.* (2004) 116 Cal.App.4th 396, 402–403 ["overall aesthetic impact" on public and private views of aluminum reservoir cover]; *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 889, 901 [MND approved for constructing 219 single-family homes on a hillside despite neighborhood complaints that the area "'is a very desirable place to live, and I do want to see that it is kept that way. . . . We have beautiful hills in Porterville. . . . I would like to see [less development] that would preserve, really the beauty of the area.'"].)

However, the community character issues Preserve raises in this case go well beyond aesthetic impacts. The community character issue here is not a matter of what is

20

pleasing to the eye; it is a matter of what is pleasing to the psyche. This includes Poway's residents' sense of well-being, pleasure, contentment, and values that come from living in the "City in the Country." In this case, community character is not merely aesthetics, but also includes psychological and social factors giving residents a sense of place and identity, what makes them feel good and at home in Poway. Indeed, in its brief, Preserve essentially concedes as much by citing an article on community character by Gary Pivo entitled, "How Do You Define Community Character?"[8] There, the author notes that community character includes a "composite of characteristics" including "socio-cultural . . . physical . . . and economic."

The superior court did not invalidate the Project's MND on aesthetic grounds. Further, there is no substantial evidence creating a fair argument that the Project is visually out of character with the surrounding community. There are single-family homes to the immediate north, east, and northwest. The Project is fully consistent with *existing* zoning and all other land use regulations.

Appendix G of the Guidelines provides a model environmental checklist for an initial study under CEQA. Under the category "aesthetics," Appendix G directs the lead agency to analyze whether the project would: (1) have a substantial adverse effect on scenic vista; (2) substantially damage scenic resources, including but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway; (3) substantially degrade the existing visual character or quality of the site and its surroundings; and (4)

---

8      The article appears in the publication *Small Town*, volume 23:3 (1992).

21

create a new source of substantial light or glare which would adversely affect day or nighttime views in the area.  (Guidelines, appen. G, § I.)

Here, the Project's initial study, attached to the Project MND, is identical to this portion of appendix G.  Poway addressed every question proposed for each potential aesthetic impact identified in appendix G, and explained why each of those issues would not result in a significant environmental impact.

The trial court's order notes the "testimony of local residents and the PVRA, who stated that the Project will have a negative effect on the community's character," including Jerry Green's e-mail (Stock Farm taught "valuable life lessons" and "brought our family closer together"), PVRA's e-mail ("The Stock Farm is truly one of Poway's finest assets and should not be allowed to be lost to development"), and Aletha Thomson's statements at the public hearing ("[T]he thing that concerns me the most is that when this city was founded, the founders of this city decided to come up with a motto of the City in the Country.  [¶] . . . And I've watched over the years and we're losing more and more country out of our city."

The impacts described by these citizens, and the other impacts discussed by citizens at the public hearing are not aesthetic impacts; rather, they are impacts to the collective psyche of Poway's residents related to living in the "City in the Country" and *social* impacts caused by the loss of the Stock Farm:

> 1.  Children will not continue to be able to ride horses, and instead will spend recreational time "sitting in front of a computer or video game, or getting into trouble."

22

2. Riding horses at the Stock Farm taught children valuable life lessons, kept children out of trouble, allowed children to excel in school and life, and brought families closer together.

3. With the neighborhood Stock Farm, horse owners do not have to take time to transport horses to the PVRA, giving "horse owners . . . more time to enjoy their lives and spend time with their families and in the community . . . ."

4. Poway would lose its "City in the Country" feel.

The fact there was a heated public debate about community character does not make it cognizable under CEQA. "Public controversy in itself does not require an EIR to be prepared 'when there is no substantial evidence in the record that the project as designed and approved will fall within the requirements of [CEQA].'" (*San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1026.)

More to the point, CEQA does not require an analysis of subjective psychological feelings or social impacts. (*City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 829 ["CEQA does not address the purely social effects of a project."], disapproved on other grounds as stated in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570, fn. 2.) Rather, CEQA's overriding and primary goal is to protect the physical environment. CEQA defines a "significant effect on the environment" as "substantial, or potentially substantial, adverse changes in *physical* conditions . . . ." (§ 21100. subd. (d) (italics added).) Similarly, the "environment" for purposes of CEQA is defined as the "physical conditions which exist within the area which will be affected by a proposed project . . . ." (§ 21060.5.) "Economic or social

23

effects of a project shall not be treated as significant effects on the environment. . . . The focus of the analysis shall be on the physical changes." (Guidelines, § 15131, subd. (a).)

Courts have rejected claims that CEQA requires analysis of psychological impacts. For example, in *City of Pasadena v. State of California*, *supra,* 14 Cal.App.4th at page 829, the court held psychological impacts (fear) to neighboring residents arising from converting an existing building to a parole office did not constitute a physical change requiring CEQA analysis. Similarly, in *Cathay Mortuary, Inc. v. San Francisco Planning Com.* (1989) 207 Cal.App.3d 275 (*Cathey Mortuary*), San Francisco issued a negative declaration with respect to its plan to acquire an existing mortuary in the Chinatown section of the city and turn the land into a public park. Project opponents argued an EIR was required because the mortuary was "an integral part of the social fabric of Chinatown." (*Id.* at p. 280.) The court rejected the argument, stating, "real parties have not shown that the controversy is related to any environmental issue." (*Id.* at p. 281.) Similarly here, Preserve's assertions that the Stock Farm is an integral part of Poway's community character as the "City in the Country" means it is a social, not an environmental, impact.

*Citizen Action to Serve All Students v. Thornley* (1990) 222 Cal.App.3d 748 (*Citizen Action*), another "closure" case, illustrates the same principle. There, local government decided to close a high school and issued a negative declaration, determining the action would cause no significant environmental impacts. Opponents argued an EIR was necessary, in part because of a "fair argument [of] adverse social, cultural and economic impacts from the closing of the school." (*Id.* at p. 757.) They asserted the

24

school was "culturally significant" and closing the school would have "devastating social and academic impact" on students, particularly economically disadvantaged students. (*Ibid.*)  The appellate court held such impacts were not cognizable as significant environmental impacts under CEQA, stating, "Appellants argue impermissibly that the economic and social changes themselves are significant."  (*Citizen Action,* at p. 758.)

Like the mortuary proposed to be closed down in *Cathay Mortuary*, there may be a fair argument that the Stock Farm is integral to Poway's community character as the "City in the Country."  And like the school closed down in *Citizen Action,* there may be substantial evidence that closing the Stock Farm and building homes in its place may have devastating impacts on young people's ability to engage in horse riding activities, especially those lacking the economic means of boarding their horses farther away from the Stock Farm.  However, as those cases hold, such impacts are psychological, social, and economic—not environmental.

CEQA is "very similar in purpose and language to the federal National Environmental Policy Act (NEPA).  (42 U.S.C. § [4321] et seq.)"  (*City of Orange v. Valenti* (1974) 37 Cal.App.3d 240, 246.)  In applying analogous provisions of NEPA, federal courts have also considered whether agencies must study and assess psychological impacts caused by a proposed project.  For example, in *Metropolitan Edison Co. v. People Against Nuclear Energy* (1983) 460 U.S. 766, the Supreme Court held that possible psychological harm to nearby residents resulting from reopening a nuclear reactor need not be considered under NEPA.  The Court stated, "Neither the language nor history of NEPA suggests that it was intended to give citizens a general

25

opportunity to air their policy objections to proposed federal actions.  The political process, and not NEPA, provides the appropriate forum in which to air policy disagreements."  (*Metropolitan Edison Co.,* at p. 777, fn. omitted; see *Olmsted Citizens for a Better Community v. United States* (8th Cir. 1986) 793 F.2d 201, 207, fn. 6 ["[A]ny psychological impact will come not as much from the sensory impact of the physical changes per se as from the knowledge that the changes are associated with a prison and from the distaste for having the prison nearby.  Those are exactly the types of concerns  . . . which are not cognizable under the NEPA."].)

CEQA does not require Poway to study psychological and social impacts upon its community character as a result of this Project.  If the Legislature wanted to define "environment" to include such psychological, social, or economic impacts on community character, it could have so provided.

For example, New York state's analogue to CEQA defines environment as "'the physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, *and existing community or neighborhood character.*'"  (*Chinese Staff & Workers Assn. v. City of New York* (1986) 68 N.Y.2d 359, 365 [502 N.E.2d 176, 179], some italics omitted.)  Thus, unlike California, under New York law, a project's social and psychological impact on community character is a relevant concern in an environmental analysis, even to the extent such impacts "might generally be regarded as social or economic."  (*Id.* at p. 180.)

26

Unlike New York, California does not define "environment" to include social or economic effects on community character.  (§ 21060.5; Guidelines, § 15360.)  Indeed, CEQA expressly excludes social or economic impacts as environmental impacts. California regulations provide that "substantial evidence" does *not* include "evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment."  (Guidelines, § 15384.)  Another regulation provides, "Economic or social effects of a project shall not be treated as significant effects on the environment. . . .  The focus of the analysis shall be on the physical changes." (Guidelines, § 15131, subd. (a).)

Accordingly, the superior court erred in determining an EIR was required to study the psychological and social impacts discussed at the public hearings and related e-mails by project opponents in this case.   CEQA requires decisions be informed and balanced, but it "must not be subverted into an instrument for the oppression and delay of social, economic  . . . development or advancement."  (Guidelines, § 15003, subd. (j).)

## VII.  *PVRA IMPACTS ON THE PROJECT DO NOT REQUIRE AN EIR*

Because PVRA is across the street from the Project, opponents voiced concerns that horses, trucks, and horse trailers associated with PVRA's activities could have a negative impact *on* the future residential uses in the Project.  The superior court cited this concern as part of the potential impact on community character.

Recently, in *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369 (*CIBA*), the Supreme Court considered whether CEQA requires an agency to consider the effects of existing environmental conditions on

27

a proposed project's future users or residents. The Court in *CIBA* held that "CEQA does not generally require an agency to consider the effects of existing environmental conditions on a proposed project's future users or residents." (*Id.* at p. 392.) *CIBA* holds there are two exceptions to this rule: First, "[W]hen a proposed project risks exacerbating those environmental hazards or conditions that already exist, an agency must analyze the potential impact of such hazards on future residents or users." (*Id.* at p. 377.) Second, "[S]pecial CEQA requirements apply to certain airport, school, and housing construction projects. In such situations, CEQA requires agencies to evaluate a project site's environmental conditions regardless of whether the project risks exacerbating existing conditions." (*Id.* at p. 378.) In the area of housing, these special statutes limit "the availability of CEQA exemptions where future residents or users or certain housing development projects may be harmed by existing conditions." (*Id.* at p. 391.)[9]

Here, a significant part of PVRA's concern was that "[a]llowing housing to be built on the Stock Farm property across the street from a heavily used equestrian facility will create untold problems for the City and those residents who would move there. No residential development should be allowed where such traffic—horses, cars, trucks and trailers—exists." *CIBA* holds this type of impact is outside CEQA's scope. (*CIBA*, *supra* 62 Cal.4th at p. 390.) In its supplemental brief, Preserve does not argue otherwise. Instead, Preserve attempts to distance itself from PVRA's assertion, stating that PRVA

_____

9    The Supreme Court's opinion in *CIBA* was issued after oral argument in this appeal. Following oral argument, we asked the parties to submit supplemental briefs on the impact of *CIBA* on the community character issue. We have now considered those supplemental briefs.

28

impacts on the Project have "never been" Preserve's argument, and the superior court's ruling was "not entirely dependent" upon this part of the PVRA e-mail. However, the court cited this excerpt from the PVRA letter in stating there was substantial evidence supporting a fair argument that the Project may have a significant effect on community character.

Moreover, as Poway notes, the environmental review process here took into account existing environmental hazards and conditions on the Project's future residents. For example, the MND noted that Project proposes on-site channelization of Rattlesnake Creek for flood control and that "[w]ork in Rattlesnake Creek will impact natural wetland habitat." The MND requires a detailed "Wetland Mitigation Plan" to be implemented "before City acceptance/approval of the project grading." The MND also requires mitigation of impacts "to 0.32 acres of on-site wetlands at a minimum ration of 1:1 by re-creation of wetlands on-site or in close proximity to the [Project]." Prior to final map approval or issuance of a grading permit, Project proponents are required to furnish proof that all outside agency approvals have been secured for the proposed alternations to the on-site portion of Rattlesnake Creek and flood channel improvements.

Additionally, to the extent PVRA's concern is more broadly construed to address traffic impacts in general, Poway considered potential transportation and traffic impacts and concluded there would be no impact. Preserve cites no evidence contradicting or disputing the following traffic analysis in the MND:

> "The [P]roject will result in 12 new homes as [a] result of the proposed 12-lot subdivision. Two of the new homes will replace 2 existing homes on the project site, for a net increase of 10 units. The

estimated average daily trips (ADT) associated with the net 10 new homes is 100. The site is currently developed with 2 single family homes and a commercial equestrian boarding and training facility. Traffic from the [P]roject is expected to be equal to or less than traffic currently generated from the site. The [P]roject will widen Tierra Bonita Road, install street lights, and provide a walkway along Tierra Bonita Road as well as a recreation trail interior to the [P]roject which connects to existing trails, thereby resulting in improved vehicular and pedestrian circulation. No impacts would occur."

The second *CIBA* exception also does not apply in this case. The Project is not exempt from CEQA, and therefore none of the statutory exceptions pertaining to housing apply. Preserve's supplemental brief does not contend otherwise.

Unfortunately, at the time the case was heard in the superior court, the court did not have the benefit of the Supreme Court's opinion in *CIBA*. In light of *CIBA*, Poway was "not required to analyze the impact of existing [PVRA] environmental conditions on [the Project's] future users or residents." (*CIBA*, *supra*, 62 Cal.4th at p. 377.)

## VIII. *NO CROSS-APPEAL*

Preserve also asked the court to set aside the MND on the grounds that (1) an EIR was required to study fire safety issues; and (2) the MND inadequately addressed impacts on Rattlesnake Creek and proposed wetland and biological impact mitigation measures. The trial court rejected both of these contentions.

Regarding fire safety, the court rejected Preserve's argument because (1) the Poway fire marshal determined there was sufficient ingress and egress for fire safety; (2) the Project also provides for a fire truck turnaround area, fire hydrant location within 100 feet, and street designs to ensure the streets will support the weight of fire equipment.

30

The court found the evidence submitted by Preserve was legally insufficient to challenge these determinations.

Regarding mitigation measures for wetlands and biological impacts, the court rejected Preserve's argument, finding "[t]he proposed mitigation measures are appropriate and do not inappropriately defer mitigation efforts." More specifically, the court stated:

> "The record indicates that portions of the Project are under the jurisdiction of the Army Corps of Engineers (ACOE) and the California Department of Fish and Wildlife (DFW). [Citations.] Thus, the involvement of these entities was required to ensure that the mitigation that was put in place would comply with these agencies' requirements. [Citations.] The City also required the applicant to 'submit a detailed Wetland Mitigation Plan, which describes in detail how wetland impact mitigation will occur' which shall be reviewed and approved by the City. [Citation.] A CLOMR [(Conditional Letter of Map Revision)], authorizing the proposed modification of Rattlesnake Creek, has already been obtained and approved by FEMA. [Citation.] FEMA will later issue a Letter of Map Revision (LOMAR) after the creek improvements are made and approved, which will include the required mitigation measures."

Preserve contends the court erred in making these determinations, and these rulings should be reversed on appeal. Preserve asserts that even if the court erred in ordering the Poway to set aside its adoption of the MND on the grounds of community character, the judgment should nevertheless be affirmed on the grounds that the MND is deficient as to public safety and wetlands and biological issues.

Citing *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173 (*Anderson*), appellants contend these issues are forfeited because Preserve did not cross-appeal. As explained *post*, we agree with appellants that these issues are forfeited.

31

As a general matter, "'a respondent who has not appealed from the judgment may not urge error on appeal.'" (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439.) "To obtain affirmative relief by appeal, respondents must themselves file a notice of appeal and become cross-appellants." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2015) ¶ 8:195, p. 8-155.)

*Anderson, supra,* 130 Cal.App.4th 1173, is a CEQA case and is instructive in applying this general rule. In *Anderson*, a city approved an EIR for a Wal-Mart shopping center including a gasoline station. Project opponents challenged the approval under CEQA, asserting the EIR inadequately evaluated urban decay, traffic, and hydrology impacts. (*Id.* at p. 1177.) The trial court granted the petition to the extent the traffic impacts of the gas station, and consequently the station's air quality impacts, had not been adequately analyzed in the EIR, but rejected the other claims. (*Ibid.*) The court severed the gas station from the rest of the project and allowed the rest of the project to proceed.

In *Anderson,* project opponents appealed, asserting the trial court's judgment violated CEQA by severing the gas station from the rest of the project. (*Anderson*, *supra*, 130 Cal.App.4th at p. 1178.) In response, the city and Wal-Mart argued the trial court erred in finding the EIR deficient regarding the gas station's traffic and air quality impacts. (*Id.* at p. 1181.) The Court of Appeal "deem[ed] the claim forfeited because city and Wal-Mart have not cross-appealed on this point." (*Id.* at pp. 1181-1182.)

Code of Civil Procedure section 906 provides a limited exception to the rule that a respondent may not urge error; it allows a respondent to "request the reviewing court to . . . review [the judgment] for the purpose of determining whether or not the appellant

was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken." (Code Civ. Proc., § 906; *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 728.) At the same time, however, Code of Civil Procedure section 906 also provides: "The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken."

Without discussing *Anderson, supra*, 130 Cal.App.4th 1173, Preserve cites Code of Civil Procedure section 906 as authority for our considering its claims the trial court erred in approving the MND as to fire safety and the adequacy of wetland and biological mitigation measures. However, this exception does not apply here.

The exception under Code of Civil Procedure section 906 is intended to permit a respondent to assert a legal theory that will result in affirmance of the judgment notwithstanding appellant's contentions. (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1121.) *Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711 is an example of the limited application of this exception. There, a manufacturer of ammunition was sued in California because of the explosion of an allegedly defective shotgun shell in Mexico from which plaintiff sustained injuries. (*Id.* at p. 717.) Before trial, the court ruled that California, rather than Mexican law would apply, it being conceded that plaintiff would have no basis for recovery under Mexican law. (*Id.* at p. 721.) A jury trial resulted in a defense verdict, and plaintiff appealed, claiming instructional error as to the law of strict liability. (*Id.* at pp. 721-722.) The defendant, who did not file a notice of appeal or cross-appeal, claimed the trial court

33

erred in applying California instead of Mexican law. Citing the exception in Code of Civil Procedure section 906, the court determined the choice of law issue was reviewable on appeal, despite the absence of a cross-appeal, because even if the appellant's contentions about instructional error were correct, the defense judgment would still have to be affirmed if Mexican law applied. (*Id.* at pp. 728-729.) Thus, the choice of law issue could be reviewed in *Kasel*, despite the absence of a cross-appeal, because if Mexican law applied, then the appellant was not prejudiced by instructional error he relied on for reversal.

As *Kasel* illustrates, the exception in Code of Civil Procedure section 906 applies where a respondent asserts an alternate legal theory upon which the judgment may be affirmed, notwithstanding the court's resolution of the appellant's contentions in the appellant's favor. (*Hutchinson v. City of Sacramento* (1993) 17 Cal.App.4th 791, 798.)

Code of Civil Procedure section 906 does not help Preserve because Preserve is not seeking to assert additional grounds in support of the judgment that granted the writ of mandate as to community character, but rather seeks to reverse a different portion of the judgment. *Kardly v. State Farm Mut. Auto Ins. Co.* (1995) 31 Cal.App.4th 1746 is analogous to this situation. In *Kardly*, judgment was entered in favor of plaintiffs on a bad faith claim against their insurer, but in the insurer's favor on the plaintiffs' claim for punitive damages. (Id. at pp. 1748-1749.) In their opposition to the insurer's appeal, plaintiffs argued the trial court erred in denying their punitive damage claim. The court held plaintiff's contention was not reviewable absent a cross-appeal. (Id. at p. 1749, fn. 1.)

34

Similarly here, absent a cross-appeal, Preserve cannot appeal from adverse determinations on fire safety and wetlands mitigation that involve different portions of the judgment from which appellants have appealed.  The judgment states, "For the reasons stated in the Minute Order, the Petition for Writ of Mandate is granted as to the issue of community character."  Even if we were to consider the merits of Preserve's assertions and determine the trial court erred in denying the petition for writ of mandate as to the issues of public safety and mitigation measures, the judgment would still be reversed "as to the issue of community character" for the reasons already stated.  Thus, the exception in Code of Civil Procedure section 906 does not apply to the issues Preserve seeks to raise.[10]

## DISPOSITION

The judgment is reversed insofar as the judgment orders, adjudges, and decrees that the petition for writ of mandate is granted as to the issue of community character. The judgment is also reversed insofar as the judgment directs the City of Poway to "set aside its adoption of the Mitigated Negative Declaration for the Tierra Bonita Subdivision Project located on Tierra Bonita Road in the City of Poway ('Project')"; "set aside its approval of Tentative Tract Map 12-002 for the Project"; and  "not issue any permits for

---

[10]     Without analysis or discussion, Preserve also cites *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18.  However, the cited portion of  *D'Amico* states a judgment that is legally correct "'will not be disturbed on appeal merely because given for a wrong reason.'"  (*Id.* at p. 19.)  *D'Amico* is off-point because, for the reasons stated, the judgment is incorrect as to community character.

35

the subject property that rely upon the Mitigated Negative Declaration or Tentative Tract Map for the Project."

Additionally, the judgment is also reversed to the extent the judgment provides that the trial court "retain[ed] jurisdiction over the proceedings by way of a return to the peremptory writ of mandate until the court has determined the City of Poway has complied with the provisions of CEQA."

The trial court is directed to enter a new judgment denying the petition for writ of mandate as to community character.

In all other respects, the judgment is affirmed.  The City of Poway and real parties in interest are entitled to their costs on appeal.


NARES, Acting P. J.

WE CONCUR:


McDONALD, J.


McINTYRE, J.

36