Filed 10/20/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| MICHAEL J. HARRINGTON, | C081263 |
| Plaintiff and Appellant, | (Super. Ct. No. PT14461) |
| v. | |
| CITY OF DAVIS et al., | |
| Defendants and Respondents; | |
| CATHERINE LEBLANC et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Yolo County, Timothy L. Fall, Judge. Affirmed.

Law Offices of Donald B. Mooney and Donald B. Mooney for Plaintiff and Appellant.

Best Best & Krieger, Harriett A. Steiner, and Kimberly E. Hood for Defendants and Respondents, City of Davis and City Council of the City of Davis.

Abbott & Kindermann, William W. Abbott, and Glen C. Hansen for Real Parties in Interest and Respondents, Catherine LeBlanc and David Christopher Sanborn.

1

Defendants and respondents the City of Davis (City) and the City Council of the City of Davis (City Council) approved a conditional use permit authorizing the use of a single family home in a residential zoning district as professional office space for three therapists. Petitioner and appellant Michael Harrington, who lives next door, filed a petition for an administrative writ of mandate asking the trial court to set aside the conditional use permit. The trial court denied the petition.

Harrington seeks review of the trial court's denial of the petition for mandate. He contends (1) the conditional use permit violates an ordinance prohibiting parking in the front yard setback, (2) the issuance of the conditional use permit resulted in a change in occupancy triggering accessible parking requirements under the California Building Standards Code (Cal. Code Regs., tit. 24, pt. 2) (Building Code), (3) the conditional use permit contemplates alterations triggering the accessible parking requirements, (4) the City Council failed to make sufficient findings to support a conclusion that compliance with accessible parking requirements would be technically infeasible, and the findings are not supported by substantial evidence, and (5) the City Council failed to make sufficient findings to support a conclusion that the permitted use is consistent with the zoning designation, and the findings are not supported by substantial evidence.

We conclude (1) the conditional use permit does not require parking in the front yard setback, (2) the City's reasonable construction of the Building Code is entitled to deference, and its determination that the issuance of the conditional use permit did not result in a change in occupancy is supported by substantial evidence, (3) Harrington has forfeited the argument that the conditional use permit contemplates alterations within the meaning of the Building Code, (4) technical infeasibility findings were not necessary, as the City Council did not rely on that theory, and (5) the City Council's consistency findings were legally sufficient and supported by substantial evidence. We shall affirm the judgment.

2

## I. BACKGROUND

### A.    *The Property*

Real parties in interest Catherine LeBlanc and Christopher Sanborn own real property improved by a single family home near the City's downtown "core" area (the Property). The Property is served by a 49 foot driveway and a single-car garage.

The Property is situated in the residential garden apartment (R-3 or R-3-M) zoning district.[1] The principal permitted uses of land in the R-3-M district are single-family dwellings and duplexes, multiple dwellings, agriculture (other than for commercial purposes), family and group day care homes, group care homes with six or fewer clients, cooperative housing, supportive housing, and transitional housing. (Municipal Code, § 40.08.020.) A variety of conditional uses may be permitted in the R-3-M zoning district, including boarding houses, nursery schools and day care centers, medical clinics, and professional and administrative offices. (Municipal Code, § 40.08.040.)

The Property was previously owned by a single practitioner of massage and acupuncture services. In 2003, the previous owner obtained a building permit and conditional use permit authorizing use of the Property as professional office space for a massage and acupuncture practice. In connection with the issuance of the building permit, the previous owner modified the Property to comply with requirements for commercial use set forth in the Building Code, which is incorporated by reference into the Municipal Code. (Municipal Code, § 8.01.010.) Among other things, the previous owner constructed a ramp providing wheelchair access from the sidewalk to the front

---

[1] The parties refer to the relevant zoning district as the "R-3-M" zoning district. The Municipal Code describes the relevant zoning district as the "residential garden apartment (R-3) district." (City of Davis Municipal Code (Municipal Code), § 40.08.010.) For consistency's sake, we shall refer to the relevant zoning district as the "R-3-M zoning district," as that is the designation most frequently used in the administrative record.

3

door.  The previous owner also paved a portion of the front yard in an effort to provide an accessible parking space; however, that space was not required by the City and was not considered a legal accessible parking space as it was not marked, striped or signed.

The previous owner stopped using the Property for commercial purposes in 2011, causing the original conditional use permit to expire.  (Municipal Code, § 40.30.090.)  The previous owner is believed to have lived at the Property for some period of time, prior to the transfer to LeBlanc and Sanborn.

B.      *The Application*

On October 28, 2013, LeBlanc, a licensed marriage and family therapist, submitted an application to the City's Department of Community Development and Sustainability (Department) for a conditional use permit authorizing use of the Property as professional office space for three therapists.  LeBlanc indicated that all therapists would work part-time schedules, with office hours ranging from 9:00 a.m. to 7:00 p.m. on Monday through Friday, and occasional evening hours as late as 8:30 p.m.  LeBlanc noted that only one of the therapists saw clients on weekends, and none offered group therapy, though some may wish to do so in the future.

LeBlanc characterized the proposed use of the Property as "low intensity," noting that therapy sessions typically last 45 to 50 minutes, allowing one client to leave before the next arrives.  She indicated that the Property offers four parking spaces (including the ersatz accessible parking space in the front yard), adding that two of the therapists, and many clients, would not need parking as they are committed cyclists.  LeBlanc also noted that she had observed ample street parking on each of her visits to the Property.

LeBlanc proposed no structural changes to the Property.  She indicated that she was considering changes to the landscaping in front of the house, which could include the addition of a bicycle parking structure.  LeBlanc also indicated that she might one day wish to relocate the accessible ramp to the rear of the house, and redesign the front porch to more closely resemble its original appearance.

4

*C.     The Staff's Response*

A City staff member responded to the application by email on November 7, 2013. In the email, the staff member explained: "The minimum required parking spaces for the use, based on 1[,]200 [square feet] of professional office space, is three. Under the R-3-M zoning, required parking spaces for non-residential uses may not be located in the front yard (*explanation*: parking may be provided within the front yard setback but would not count toward the parking requirement). Therefore, as shown, the ADA [accessible] space located in the front yard would not count as a required space. Perhaps this means using the garage for one space to meet the required number of spaces. If so, please provide the dimensions of the garage and a plan showing the location of the required parking spaces in a conforming location."

The staff member asked LeBlanc to "explain how a tandem parking configuration would work for clients." The staff member also warned that, "the ADA [accessible] parking space may be required in a specific dimensioned, marked, and signed space." The staff member encouraged LeBlanc to contact the chief building inspector or senior plans examiner for more information regarding accessible parking.

LeBlanc forwarded the staff member's email to Sanborn and a member of the City Council. In a cover email, LeBlanc wrote: "I'm feeling less hopeful at this point. The parking requirements are over the top, and I think impossible, if we have to produce, stripe, and sign a handicapped spot and accommodate all therapist and client parking onsite. Does this seem unreasonable to you? Is there any way we can push back against this?"

*D.     The Staff Report and Planning Commission Hearing*

The planning commission considered the application at a public hearing on January 8, 2014. In anticipation of the hearing, the staff submitted a report opining that the proposed use of the Property was "consistent with the intent of the professional office uses that are conditionally allowed in the R-3-M District," "compatible with the

5

residential and commercial mixed uses," and "will not change or adversely affect the character of the surrounding uses and properties." With respect to parking, the report explained:

"Three parking spaces are required for the use based on [one] space per 400 gross square feet of the building (1,200 [square feet]). The three spaces would be provided in a tandem configuration with one parking space provided in the garage and two spaces in the driveway. The number of parking spaces and the configuration would be the same as those that were in place under the previous [conditional use permit]. With the exception of the first tandem space in the driveway, the arrangement of the parking spaces does not lend itself to use for in and out clients, but could be utilized by the applicant and other therapists. Keys would be left in a central place within the house and cars could be moved if necessary. This would potentially eliminate the need for long term on-street parking in the neighborhood for three vehicles. The applicant would provide one van accessible parking space, with striping and signage installed."

Although the report opined that parking "would not be a nuisance to the neighboring areas," the report nevertheless observed that "the previous [conditional use permit] included a condition that should parking become a problem for the residents of 7th Street located between F and G Streets, parking would be reviewed by the [p]lanning [c]ommission and additional conditions could be imposed to address the parking issues." The report recommended that the conditional use permit be approved, with a similar parking condition incorporated into the conditions of approval.

The staff report attached a number of exhibits, including the application and Harrington's written response thereto, which raised a number of concerns regarding the proposed use of the Property. As relevant here, Harrington was concerned that street parking, though plentiful now, might become scarce in the future. Harrington was also concerned that the project would be incompatible with the residential character of the R-3-M zoning district. The staff report also attached a chart summarizing and responding to

6

Harrington's concerns. The staff did not recommend any changes to the proposed parking plan based on Harrington's concerns.

At the hearing, City staff members orally presented the project to the planning commission. Following the presentation, which reiterated the substance of the staff report, members of the planning commission were invited to ask questions. One of the commissioners expressed concern about accessible parking, asking whether the ersatz parking space "meets professional office standards." A staff member replied: "Yes. It meets all the legal requirements in terms of dimensions, striping, parking—or parking dimensions, striping, signage. And the applicant met with us and with the chief building official, and we went out and did all the measurements, and it would—it would comply." The staff member continued: "As it is now and with the previous use, it was just a block of cement. It was never properly marked. And so the applicant is going to comply with the accessible parking requirements." The commissioner responded that, as a landscape architect, he looked "a little skeptically at the accessible parking arrangement." Nevertheless, he allowed that accessible parking was "not necessarily the planning commission's purview to be—that's a [B]uilding [C]ode issue."

Following further discussion of accessible parking (none of which resulted in any specific commitments or proposals), the planning commission heard from LeBlanc, Sanborn, and members of the public. Most members of the public were supportive of the proposed use. For example, a realtor and longtime Davis resident supported the project, noting that the area surrounding the Property had become increasingly commercial, and warning against the "terrible precedent" that would be set by placing too many restrictions on an otherwise reasonable use of property. The president of the Old North Davis Neighborhood Association, however, urged the planning commission to limit the proposed use to preserve the residential character of the neighborhood. Harrington did not testify.

7

Upon the closure of the public portion of the hearing, the commissioners deliberated and approved the conditional use permit by a vote of five to one. In a letter dated January 13, 2014, the planning commission found that the proposed use of the Property was "of the same general character as the other conditional and general permitted uses" in the R-3-M district. The planning commission further found that, "All conditions and requirements deemed necessary and in the public interest have been or will be met" and "[t]he proposed use will not constitute a nuisance or be detrimental to the public welfare of the community in that the intensity of the use and specific conditions reducing the impact on adjacent properties have been incorporated into this approval."

The letter set forth eighteen separate conditions of approval, four of which pertain to parking. The parking conditions are as follows:

"5.     Three on-site parking spaces are required in a conforming configuration and location.

"[¶] . . . [¶]

"7.     The applicant shall take pro-active measures (such as pamphlets or email or other regular reminders) for clients to be directed to park along G Street, north of 7th Street or in front of the subject property on the north side of 7th Street.

"8.     The therapists shall be directed to park in the tandem spaces and not on the street.

"9.     Should parking become a problem for the residents of 7th Street located between F and G Streets as a direct result of the subject property's professional office use, as determined by the [d]irector of [the Department], the conditional use permit approval may be reviewed by the [p]lanning [c]ommission. The [c]ommission may impose additional conditions of approval to address parking impacts."

The letter does not say anything about accessible parking.

The letter also describes several conditions designed to protect Harrington's privacy. As relevant here, the letter states that the front porch would be screened with lattice and vines on the side facing Harrington's property, and a privacy fence and lattice would be installed along the driveway. The letter also states that the sidewalk in front of the Property would be repaired.

E.      *The Updated Staff Report and City Council Hearing*

Harrington appealed the conditional use permit arguing that the approved use "is not of the same general character as the other conditional and general permitted uses within R-3-M." Harrington also argued that the parking plan "does not conform to law and is nonsensical." An appeal hearing was conducted before the City Council on February 11, 2014.

In anticipation of the hearing, City staff members submitted an updated staff report, recommending that the City Council find the planning commission did not err in approving the conditional use permit. With respect to the character of the approved use, the staff explained:

"In reviewing the [conditional use permit] for psychotherapy use, the [p]lanning [c]ommission considered that there are commercial uses a block away within the Food Coop and corresponding commercial center. Other businesses and mixed-use opportunities exist along G Street located immediately to the south and east. Other conditionally permitted office uses operate in the surrounding area. Apartments, senior housing, single family and duplexes also exist within the immediate vicinity. A massage and acupuncture therapy use operated under a [conditional use permit] on the site from 2003 to 2011. Given the intensity of the proposed business and the transitional and mixed-use nature of the area, the [p]lanning [c]ommission found the proposed use to be of the same general character as other conditional and general permitted uses with[in] the R-3-M district."

With respect to parking, the staff explained:

9

"The number of parking spaces would comply with the city's parking standard based on the use and square footage of the structure (one space for each 400 square feet). The project would provide three off-street parking spaces in a tandem configuration in the existing driveway. This is the same parking arrangement approved for the previous office use [conditional use permit]. While new construction of an office building would not typically include tandem parking, in this case the structure is a single-family dwelling and the parking exists. The use was built as a single-family home. The principal permitted use is still a single-family dwelling and zoning permits consideration of using it as an office with a conditional use permit. Municipal Code [section] 30.30.030 states that the nature and condition of the conditionally permitted use is to exist in *harmony with surrounding residential use.* Converting much of the rear yard from open space to paving to create a parking lot large enough to accommodate three vehicles would significantly change the residential character of the property and was not recommended. The availability of on-street parking has also been considered.

"It is staff's opinion that requiring full conformance to the parking layout requirements of an office use as though it is being constructed as an office would generate greater potential impacts to neighbors. Further, requiring a parking lot on the north side of the site may make it more difficult for the use to revert back to single family in the future."

The updated staff report further observed that, "On-street parking is generally available within the area during normal business hours and use of these spaces by a low number of clients would not impact the neighborhood." The updated staff report concluded that, "the [p]lanning [c]ommission did not make an error in the approval of the [c]onditional [u]se [p]ermit to allow office use in a residential district at [the Property] and therefore, the approval should be upheld."

At the hearing, a staff member summarized the proposed use and conditions of approval. The City Council also heard from LeBlanc, who testified that she had already completed or was in the process of completing the various privacy-related conditions of approval (such as the installation of window coverings and construction of a new fence). The City Council then closed the public hearing.[2] Following a brief discussion, the City Council unanimously concluded that the planning commission did not err in approving the conditional use permit.

The City Council's findings and conditions of approval are set forth in a letter dated February 13, 2014. The City Council's findings are substantially the same as the planning commission's findings. Among other things, the City Council found, "That the use conforms to the City of Davis General Plan and R-3-M District in that the [p]lanning [c]ommission has determined the use to be of the same general character as the other conditional and general permitted uses within R-3-M (Residential Garden Apartments) and is compatible as a professional office use." In addition, the City Council found, "That the use will not have a detrimental impact on parking. The parking plan provides the required number of on-site parking spaces for office use based on the square footage of the 1,200 square feet dwelling (one parking space per each 400 square feet). The required number of parking spaces ([three]) exist in a conforming tandem configuration in that the principal permitted use of the property is single-family residential. There is on-street parking available in the area to accommodate the use." The conditions of approval are substantially the same as the conditions of approval set forth in the planning commission's letter. As before, the conditions of approval do not say anything about accessible parking.

_____

[2] Harrington did not appear.

11

*F.*	*Accessible Parking Requirements:  Planning Commission Determination and City Council Hearing*

Several months later, on June 30, 2014, LeBlanc, through her counsel, sent a letter to the Department seeking clarification of the accessible parking requirements for the Property.  The director of the Department responded by letter dated July 21, 2014. Following an analysis of the previous owner's accessibility upgrades, the director concluded:  "There is no obligation under the zoning code, 2014 project approvals for the [c]onditional [u]se [p]ermit, or the . . . Building Code, for the property owner to provide additional accessible improvements for office use beyond those previously required and completed in 2003."

The City notified Harrington of its determination that an accessible parking space was not required.  Harrington appealed, arguing, as he does here, that (1) an accessible parking space is required, and (2) the required parking space could not be provided in the front setback area.  (See Municipal Code, § 40.01.010 [defining "setback" and "setback lines" as "[t]he minimum allowable horizontal distance from a given point or line of reference such as a street right of way to the nearest vertical wall or other element of a building or structure as defined herein"].)

A hearing was set before the City Council on January 13, 2015.  In anticipation of the hearing, the City staff (including the director of the Department) prepared a report summarizing the permit history of the Property.  With respect to accessible parking, the report explained:

"In 2003 a building permit (03-1868) was issued to convert the existing residence at [the Property] from building code R3 occupancy (residential) to a B occupancy (commercial).  The building permit triggered compliance with [section] 1134B Accessibility for Existing Buildings of the 2001 . . . Building Code.  [Section] 1134B.2.1 requires an accessibility upgrade obligation equivalent to 20% of the valuation of the project for projects that do not exceed the established valuation threshold.  The project

12

valuation did not exceed the valuation threshold for full compliance. The valuation of the project was $9,000; therefore the accessibility upgrade obligation of 20% of the valuation for this project was $1,800. To meet the accessibility obligation for building permit 03-1868 the project scope included an accessible primary entrance, an accessible ramp from the public right-of-way, and an accessible restroom in compliance with [section] 1134B.2.2. Once the 20% obligation was met for this specific project there were no further accessibility upgrade requirements.

"[¶] . . . [¶]

"The previous property owner paved a portion of the front yard in an effort to provide an accessible parking space, but the space was not required under the Building Code or by the City under the [previous conditional use permit], nor was the space a legal accessible parking space as it was not marked, striped, or signed. Further, required parking is prohibited within the front yard setback for office use in a residential district. This would not prohibit the space from being provided or used; however, the space would not count toward meeting the required number of parking spaces. The use required three parking spaces which were provided in a 2-car tandem configuration in the driveway and in one space in the single-car garage, all located behind the front yard setback.

"During the intervening years between 2011 when the [previous conditional use permit] ceased and 2014 when the new [conditional use permit] was approved, the structure may have been used for living purposes for a period of time. However, the occupancy of the structure did not change. The occupancy was not converted from B occupancy (commercial) back to R3 (residential). The occupancy is, and remains B. The intent of the new [conditional use permit] was to ensure compliance with zoning. The [new conditional use permit] was required only because the prior [conditional use permit] had lapsed, not due to a change in occupancy. No building permits were issued under the new [conditional use permit] that triggered additional accessibility upgrades. The parking plan provided by the application for 2014 [conditional use permit] included an

13

accessible space shown in the front yard setback, but this space was not required under the Building Code or by the City, nor was the accessible space a condition of approval of the [conditional use permit]. There is no requirement under the new [conditional use permit] to provide an accessible space. The number of parking spaces required for the current [conditional use permit] remains the same as required under the prior [conditional use permit] ([three] spaces). The spaces are provided in the same location and configuration as in 2003, all located behind the front yard setback."

Although the staff concluded that no change in occupancy had occurred, the report noted that even a change in occupancy would not trigger accessibility requirements for new construction if compliance with new construction standards would be "technically infeasible." (See Building Code, § 3411.4.2.)[3] The staff opined that findings could be made that accommodation of an accessible parking space would be technically infeasible, as the new space would either have to be in the front yard setback (creating a conflict with citywide parking standards for residential districts), in the area currently occupied by the garage (necessitating the removal of the garage and discouraging future residential use of the Property), or in the backyard (resulting in the loss of desirable open space). "Ultimately," the report concluded, "staff's determination that an accessible parking space is not required remains unchanged, and that findings for technical infeasibility are not necessary." The report recommended that Harrington's appeal be denied.

Following a hearing, the City Council voted unanimously to deny Harrington's appeal application. The City Council's findings were set forth in a letter dated January 15, 2015. The letter states:

"An accessible parking space is not required for the following reasons:

---

[3] Unless otherwise indicated, references to the Building Code are to the 2013 edition.

14

"[1.]  The occupancy of the subject property under the California Building Code was legally converted in 2003 from R3 (residential) to B (commercial).

"[2.]  There have been no new building permits issued under the [conditional use permit] that changed the occupancy of the property or triggered new or additional accessibility requirements.

"[3.]  The [conditional use permit] approved in 2013 for office use did not change the occupancy of the property.

"[4.]  The project remains in compliance with 2001 . . . Building Code [section] 1134B Accessibility for Existing Buildings and with [Building Code section] 1134B.2.1 accessibility upgrade obligations.

"(b)  The required number of parking spaces for the project has been met.  The parking spaces are provided in a conforming configuration located behind the front yard setback, consistent with the requirements of [Municipal] [C]ode [s]ection 40.25.080(a)."

As we shall discuss, the City's construction of the Building Code is reasonable, and its findings are supported by substantial evidence.

G.    *Trial Court Proceedings*

Harrington filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5.  Harrington's original petition sought a peremptory writ of mandate ordering the City to vacate and set aside approval of the conditional use permit. Harrington subsequently filed a first amended petition for writ of mandate, which additionally sought a peremptory writ of mandate ordering the City to require an accessible parking space at the Property.

The trial court held a hearing on the petition for writ of mandate on December 1, 2015.  In anticipation of the hearing, the trial court issued a tentative ruling denying the petition on the ground that Harrington "fails to demonstrate that [the City] acted arbitrarily, capriciously, or without any evidentiary basis."  "However," the tentative ruling continued, "the Court interprets . . . Municipal Code section 40.25.080(a) to

15

prohibit all off-street parking within the front yard setback line." Accordingly, the tentative ruling concluded, "the parking space previously located therein may not be used for parking." Following oral argument, the trial court adopted the tentative ruling and denied the petition.

Harrington filed a timely notice of appeal.

## II. DISCUSSION

*A.    Standard of Review and Principles of Statutory Construction*

The issuance of a conditional use permit is a quasi-judicial administrative action reviewed under administrative mandamus procedures. (Code Civ. Proc., § 1094.5; *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1005; *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 674.) In reviewing the trial court's judgment on a petition for writ of mandate, we " 'scrutinize the record and determine whether substantial evidence supports the administrative agency's findings and whether these findings support the agency's decision.' " (*Horwitz v. City of Los Angeles* (2004) 124 Cal.App.4th 1344, 1354.) On questions of fact, we indulge all presumptions and resolve evidentiary conflicts in favor of the agency's findings and decision.[4] (*Ibid.*)

We exercise independent judgment on legal issues, including the interpretation of municipal ordinances. (*Horwitz v. City of Los Angeles, supra,* 124 Cal.App.4th at p. 1354.) "Courts interpret municipal ordinances in the same manner and pursuant to the same rules applicable to the interpretation of statutes." (*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1087.) That said, a city's interpretation of its own ordinance is " 'entitled to deference' in our independent review of the meaning or application of the law." (*Id.* at p. 1091; see *Anderson First Coalition v. City of Anderson*

---

[4] The "agency" in this case is the Department, acting first through the City staff, then through the planning commission and City Council.

16

(2005) 130 Cal.App.4th 1173, 1193 [" 'an agency's view of the meaning and scope of its own [] ordinance is entitled to great weight unless it is clearly erroneous or unauthorized' "].)

In reviewing the City's interpretation of the Municipal Code, we apply the framework developed in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8 (*Yamaha*)), in which our Supreme Court explained that the degree of deference accorded an agency's interpretation is " ' "not susceptible of precise formulation, but lies somewhere along a continuum," ' " or, in other words, is "*situational.*" (*Id.* at pp. 7, 12; see *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 928 [applying *Yamaha* in reviewing zoning administrator's interpretation of city charter and municipal code]; *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219 [applying *Yamaha* in reviewing hearing officer's interpretation of mobile home rent control ordinance].) Greater deference should be given to an agency's interpretation where " 'the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " (*Yamaha, supra,* at p. 12, quoting Cal. Law Revision Com., Tent. Recommendation, Judicial Review of Agency Action (Aug. 1995) p. 11 (Tentative Recommendation).) Greater deference is also appropriate where there are "indications of careful consideration by senior agency officials." (*Yamaha, supra,* at p. 13.)

Here, the City's decisions were the product of an agency charged with regulating zoning practices and ensuring compliance with the Building Code. In reaching its decisions, the City was required to balance the requirements of the zoning and building codes against the interests of the applicant and neighbors, taking into account the historical uses of the Property, the residential character of the neighborhood, and the evolving needs of the community. As we shall discuss, the City's decisions were " 'entwined with issues of fact, policy, and discretion' " (*Yamaha, supra*, 19 Cal.4th at

17

p. 12), prompting us to give " ' "great weight and respect" ' " to the views of the agency. (*American Coatings Assn. v. South Coast Air Quality Dist.* (2012) 54 Cal.4th 446, 461.) In taking into account the agency's views, however, we recognize the " ' "ultimate responsibility for the construction of the statute" ' " lies with us. (*Ibid.*)

B.      *Municipal Code Section 40.25.080(a)*

Harrington contends the City abused its discretion in approving the conditional use permit. Specifically, Harrington argues the conditional use permit violates Municipal Code section 40.25.080(a), which provides: "Off-street parking spaces, including required aisles, shall be located behind the front and street side yard setback line in all residential districts when the principal use is other than a single-family or duplex dwelling."

According to Harrington, (1) the conditional use permit required LeBlanc to provide an accessible parking space, (2) the only place for such a parking space was within the front yard setback, (3) the City, in response to LeBlanc's request to "push back" on accessible parking requirements, allowed her to offer the required accessible parking space within the front yard setback, thereby (4) violating Municipal Code section 40.25.080(a). Harrington's argument founders on the premise that the conditional use permit required LeBlanc to provide an accessible parking space.

Contrary to Harrington's suggestion, the conditional use permit does not require LeBlanc to provide an accessible parking space in the front yard setback or anywhere else. Although LeBlanc referred to the existence of an accessible parking space in her application, there was no suggestion that an accessible parking space would or should be required. To the contrary, the staff was clear that the purported accessible parking space "would not count as a required space." Similarly, though the staff indicated that accessible parking would be provided in the report, and the subject was discussed in colloquy before the planning commission, there was no finding that accessible parking

18

was required, whether in the front yard setback or elsewhere. Consequently, though accessible parking was discussed during the approval process, the provision of an accessible parking space was not a condition of approval for the conditional use permit. It follows that the conditional use permit does not require accessible parking in the front yard setback, and does not give rise to a violation of Municipal Code section 40.25.080(a).

Harrington implies that the conditional use permit was the product of backroom dealings. Although he repeatedly refers to the email in which LeBlanc inquires about "pushing back" on accessible parking requirements, he fails to demonstrate, by reference to the record, that the City bowed to political pressure in approving the conditional use permit or otherwise abused its discretion. In the absence of any such evidence, we presume the City regularly performed its official duty. (See Evid. Code, § 664; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335.)

C.      *Change in Occupancy*

Next, Harrington argues that issuance of the conditional use permit effectuated a change in occupancy that triggered the accessible parking requirements for new construction under the Building Code. (Building Code, §§ 11B-208.2 and 11B-208.2.4.)[5] Harrington's argument is based on Building Code section 3408.1, which provides:

"No change shall be made in the use or occupancy of any building that would place the building in a different division of the same group of occupancies or in a different group of occupancies, unless such building is made to comply with the requirements of this code for such division or group of occupancies. Subject to the

_____

[5] Harrington argues the accessible parking requirements require LeBlanc to provide one accessible parking space at the Property. We conclude that the accessible parking requirements do not apply, and express no opinion on the number of parking spaces that would be required if they did.

19

approval of the building official, the use or occupancy of existing buildings shall be permitted to be changed and the building is allowed to be occupied for purposes in other groups without conforming to all the requirements of this code for those groups, provided the new or proposed use is less hazardous, based on life and fire risk, than the existing use."[6]

Relying on Building Code section 3408.1, Harrington contends the conditional use permit resulted in a change in "use or occupancy" necessitating compliance with the accessible parking requirements for new construction.

Harrington's argument proceeds in four parts. First, Harrington observes that the occupancy classification for the Property changed from R-3 (residential) to Group B (business) when the City approved the previous owner's applications for conditional use and building permits in 2003. Second, Harrington argues that the occupancy classification "reverted" to R-3 (residential) upon the expiration of the previous conditional use permit in 2011, such that "single-family residential was the only permitted use at the time the City approved . . . LeBlanc's conditional use permit." Third, Harrington contends, "[a] change in occupancy and use has occurred as a result of the City's approval of the [current conditional use permit] as it has changed the use from single family residential to professional offices allowing for mental health counseling." Fourth, Harrington concludes that the asserted change in occupancy or use necessitates compliance with the accessible parking requirements for new construction.

---

[6] We grant the City's request for judicial notice of certain provisions of the Building Code. We take judicial notice of other relevant provisions of the Building Code on our motion. We note that the parties refer to various editions of the Building Code in their papers. The relevant edition of the Building Code, for purposes of determining whether approval of the conditional use permit effectuated a change in occupancy, was the 2013 edition, the operative edition at the time the conditional use permit was approved.

The City responds that the expiration of the previous conditional use permit changed the *permitted use* of the Property under the zoning code, but not the *occupancy classification* under the Building Code. According to the City, changes in occupancy classification can only occur when (1) a building has been made to comply with Building Code requirements for the new occupancy or otherwise approved by the local building official, and (2) a certificate of occupancy has been issued. The City finds support for its position in section 111.1 of the Building Code, which provides:

"No building or structure shall be used or occupied, *and no change in the existing occupancy classification of a building or structure or portion thereof shall be made* until the *building official* has issued a certificate of occupancy therefor as provided herein." (Italics added.)

It is undisputed that the building official did not issue a certificate of occupancy when the previous conditional use permit expired. Accordingly, the City concludes, there was no change in the occupancy classification for the Property, and no trigger of the Building Code's accessible parking requirements.

The City's construction of the Building Code is entitled to significant deference. (*City of Monterey v. Carrnshimba, supra,* 215 Cal.App.4th at p. 1091.) The purpose of the Building Code is "to establish the minimum requirements to safeguard the public health, safety and general welfare through structural strength, means of egress facilities, stability, sanitation, adequate light and ventilation, energy conservation, and safety to life and property from fire and other hazards attributed to the built environment and to provide safety to fire fighters and emergency responders during emergency operations." (Building Code, § 101.3 (2016); see also Building Code, § 101.3 (2013) [same].) The City, which is charged with enforcing the Building Code, has significant expertise in evaluating projects for compliance with minimum building standards, including accessible parking requirements. (Building Code, §§ 1.8.3.1 and 104.2.) The City is also charged with enforcing the zoning code, which regulates the City's land use and zoning

21

practices. (Municipal Code, § 40.37.030.) The City's decision was thus the product of the agency responsible for administering both of the relevant regulatory schemes, one of which requires technical knowledge of applicable building standards. As such, the City's conclusion that a change in permitted use under the zoning code does not give rise to a change in occupancy under the Building Code is " 'entwined with issues of fact, policy, and discretion,' " and entitled to " 'great weight and respect.' " (*Yamaha, supra,* 19 Cal.4th at p. 12).)

Harrington fails to demonstrate that the City's construction of the Building Code is "clearly erroneous or unauthorized." (*Anderson First Coalition v. City of Anderson, supra,* 130 Cal.App.4th at p. 1193.) Relying on the definition of "occupancy" in the 2001 edition of the Building Code, Harrington argues that "occupancy is determined by the type of use." (See Building Code, § 216 (2001) [defining "occupancy" as "the purpose for that [*sic*] a building, or part thereof, is used or intended to be used"].) Taking the relationship between "occupancy" and "use" a step further, Harrington concludes that a change in permitted use under the zoning code necessarily results in a change in occupancy under the Building Code. We are not persuaded.

As a preliminary matter, we fail to see the significance of the 2001 edition of the Building Code, which was not effective at the time the conditional use permit was approved.[7] Moreover, and more importantly, we are not convinced that the regulatory framework as a whole supports Harrington's contention that a change in use automatically results in a change in occupancy.

Building Code section 105.1 provides: "Any owner or authorized agent who intends to construct, enlarge, alter, repair, move, demolish, *or change the occupancy of a building or structure*, or to erect, install, enlarge, alter, repair, remove, convert or replace

---

[7] We note that the term "occupancy" is not defined in the applicable 2013 edition of the Building Code. (Building Code, § 202.)

22

any electrical, gas, mechanical or plumbing system, the installation of which is regulated by this code, or to cause any such work to be done, *shall first make application to the building official and obtain the required permit*."  (Italics added.)

As noted, Building Code section 111.1 provides that "no change in the existing occupancy classification of a building or structure or portion thereof shall be made until the building official has issued a certificate of occupancy therefor as provided herein." Together, these provisions evince an intent to make the building official the final authority on the question of whether a change in occupancy has occurred.  Neither of these provisions supports Harrington's contention that a change in occupancy can occur sub silentio, without the building official's authorization or approval.  Applying the principle that "the more specific provision . . . takes precedence over the more general one" (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 857), which is expressly incorporated into the Building Code (Building Code, § 102.1), we conclude that the City's construction of the Building Code is more reasonable than Harrington's, which relies on a general definition from an out-of-date edition.  We further conclude that the City's construction of the Building Code is more likely to effectuate its public safety purpose, as it gives the building official an opportunity to assess the structure for compliance with minimum building standards before approving a change in occupancy.

Harrington attempts to avoid our conclusions by invoking Building Code section 3408.2, which provides:  "A certificate of occupancy shall be issued where it has been determined that the requirements for the new occupancy classification have been met." Relying on the section's use of the word "shall," Harrington argues that the building official acquired a mandatory duty to issue a certificate of occupancy upon the happening of the change of use, which he failed to discharge.  Again, we are not persuaded. Building Code section 3408.2 makes clear that the duty to issue a certificate of occupancy attaches following a determination that the requirements for the new occupancy classification have been met.  (Building Code, § 3408.2 ["where it has been

23

determined that the requirements . . . have been met"].) As we have already suggested, the regulatory framework and legislative purpose of the Building Code compel the conclusion that the building official is responsible for determining whether the applicable requirements have been met. (Building Code, § 3408.1.) The building official's determination would naturally precede the issuance of a certificate of occupancy, lending further support to the City's argument that a change in occupancy occurs when (1) the building has been made to comply with Building Code requirements for the new occupancy or otherwise approved by the local building official, and (2) a certificate of occupancy has been issued. Based upon our independent review, we conclude that the City's construction of the Building Code is reasonable and entitled to deference.

We further conclude that the City's determination that a change in occupancy did not occur is supported by substantial evidence. The administrative record demonstrates that the Department and City Council carefully considered the permitted uses of the Property, taking into account the expiration of the previous conditional use permit, the subsequent use of the Property as a single family residence, the issuance of the current conditional use permit, and the accessible parking requirements of the Building Code. The staff prepared a report, co-authored by the director of the Department, explaining that, though the previous owner may have lived at the Property following the expiration of the prior conditional use permit, "the occupancy of the structure did not change. The occupancy was not converted from B occupancy (commercial) back to R3 (residential). The occupancy is, and remains B." The City Council subsequently found that the issuance of the conditional use permit "did not change the occupancy of the [P]roperty." The City Council's factual determinations, which are based on the staff report, are supported by substantial evidence. (See *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1387 [" '[a]n agency may . . . rely upon the opinion of its staff in reaching decisions, and the opinion of staff has been recognized as constituting substantial evidence' "].) We therefore reject Harrington's

24

contention that the change in permitted use resulted in a change in occupancy triggering the accessible parking requirements.

## D. *Exhaustion of Administrative Remedies*

Harrington argues for the first time on appeal that the conditional use permit contemplates "alterations" to the Property that trigger the Building Code's accessible parking requirements. Harrington's new argument is based on Building Code section 11B-201.1, which provides: "All areas of newly designed and newly constructed buildings and facilities and altered portions of existing buildings and facilities shall comply with these requirements." According to Harrington, the screened front porch, driveway fence, and sidewalk repairs constitute "altered portions of existing buildings and facilities," such that the accessible parking requirements apply. We need not address Harrington's "alterations" argument, as Harrington failed to present it to the City Council, and thus failed to exhaust his administrative remedies. (Gov. Code, § 65009, subd. (b)(1).)

"Under the doctrine of exhaustion of administrative remedies, 'where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act. [Citation.] This rule 'is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis* and binding upon all courts.' [Citation.] Exhaustion of administrative remedies is, in short, 'a jurisdictional prerequisite to resort to the courts.' [Citation.] Its rationale is the prevention of interference with the jurisdiction of administrative tribunals by the courts, which are only authorized to review final administrative determinations. [Citation.] 'The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review.' " (*Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1447.)

In order to satisfy the exhaustion of administrative remedies requirement, "the exact issue raised in the lawsuit must have been presented to the administrative agency so that it will have had an opportunity to act and render the litigation unnecessary." (*Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894, disapproved on other grounds in *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 529; see also *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198.) Generalized objections are not sufficient to preserve specific legal and factual issues for judicial review. (*Coalition for Student Action v. City of Fullerton, supra,* at p. 1197; see also *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019-1020.)

Here, though Harrington generally objected to the City's determination that accessible parking was not required, he never argued that the Building Code's accessible parking requirements were triggered by contemplated alterations to the Property. Having failed to raise his "alterations" argument at the administrative level, Harrington has waived the argument on appeal. (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 791 [refusing to consider statutory argument not made at administrative level].)

## E.     Technical Infeasibility

Building Code sections 3411.4 and 3411.4.2 together provide that existing buildings that undergo a complete change in occupancy must have enumerated accessible features, including accessible parking. Building Code section 3411.4.2 further provides that compliance with accessibility requirements may be relaxed or excused, "[w]here it is technically infeasible to comply with the new construction standards." Harrington argues the City Council failed to make sufficient findings to support the conclusion that compliance with accessible parking requirements would be technically infeasible, and the

City Council's findings were not supported by substantial evidence.  We are not persuaded.

As the City correctly observes, the City Council made no technical infeasibility findings because there was no attempt to rely on the technical infeasibility exception.  Although the staff observed that technical infeasibility findings *could* be made, the staff deemed them unnecessary in light of its determination that accessible parking was not required.  The City Council accepted the staff's determination and likewise concluded that accessible parking was not required.  Having so concluded, the City Council had no occasion to consider whether such parking was technically infeasible.  We reject Harrington's argument that the City Council failed to make technical infeasibility findings and the findings were not supported by substantial evidence.

*F.      Consistency with R-3-M Zoning District*

Finally, Harrington argues the conditional use permit conflicts with Municipal Code section 40.08.010, which provides:  "The purpose of a residential garden apartment (R-3) district is to stabilize and protect the residential character of the district and to promote, insofar as compatible with the intensity of land use, a suitable environment for family life."  According to Harrington, (1) the City Council failed to make sufficient findings that the project protects the residential character of the district and promotes family life, and (2) the consistency findings are not supported by substantial evidence. We address these contentions in turn.

*1.      The City Council's Findings to Support Its Decision*

"An administrative agency must 'render findings sufficient both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the board's action.' [Citation.] But such findings need not be stated with the formality and precision required in judicial proceedings. [Citation.]  They are to be liberally construed to support rather than defeat the decision under review.  [Citation.]  Nor must the court remand if it determines that

27

necessary findings may be reasonably implied.  [Citation.]  We must uphold the decision of an administrative agency challenged pursuant to [Code of Civil Procedure] section 1094.5 if 'the agency "in truth found those facts which as a matter of law are essential to sustain its . . . [decision]." ' " (*North Gualala Water Co. v. State Water Resources Control Bd.* (2006) 139 Cal.App.4th 1577, 1603.)

Here, the City Council specifically found, "That the use conforms to the City of Davis General Plan and R-3-M District in that the [p]lanning [c]ommission has determined the use to be of the same general character as the other conditional and general permitted uses within R[-]3-M (Residential Garden Apartments) and is compatible as a professional office use."  Although the City Council's findings do not expressly refer to Municipal Code section 40.08.010, the City Council made an unambiguous consistency finding, which was impliedly based on the purpose of the underlying zoning ordinance.  These findings provide an adequate analytical roadmap of the City Council's decision to deny Harrington's appeal and affirm the planning commission's decision to approve the conditional use permit.

        2.        *Sufficiency of the Evidence to Support the City Council's Findings*

Harrington contends the City Council's consistency findings are not supported by substantial evidence.  Under our substantial evidence review, the City Council's consistency findings are presumed to be supported by the administrative record, and Harrington has the burden to show there is no substantial evidence whatsoever to support them.  (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 469; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335-336.)  Harrington does not meet this burden.

Under Municipal Code section 40.30.080(a), "The planning commission or city council shall issue a conditional use permit provided the planning commission or city council is satisfied that the proposed structure or use conforms to the requirements and intent of this chapter and the city master plan, that any additional conditions and

28

requirements stipulated by the planning commission or city council have been or will be met, and that such use will not, under the circumstances of the particular case, constitute a nuisance or be detrimental to the public welfare of the community."

Here, the City Council was asked to consider the planning commission's decision to approve a conditional use permit in the R-3-M zoning district, in which medical clinics and professional and administrative offices are conditionally permitted uses. (Municipal Code, § 40.08.040.) The City Council was advised that (1) the Property was previously permitted for use as professional office space for a massage and acupuncture therapy practice, (2) apartments, senior housing, and other conditionally permitted office uses exist in the surrounding area, (3) a commercial shopping center is one block away, and (4) "the [p]lanning [c]ommission found the proposed use to be of the same general character as other conditional and general permitted uses with[in] the R-3-M district." The City Council was also advised that the conditional use permit places limits on the proposed use, including limits on the hours of operation and number of therapists and clients. The City Council was further advised that, "On-street parking is generally available within the area during normal business hours and use of these spaces by a low number of clients would not impact the neighborhood."

The City Council heard that LeBlanc had already satisfied, or was in the process of satisfying, conditions of approval designed to protect Harrington's privacy. The City Council also heard that the City staff believed the approval should be upheld. On this record, we have little difficulty concluding that the City Council's consistency findings are supported by substantial evidence. We reject Harrington's argument to the contrary.

29

## III.  DISPOSITION

The judgment is affirmed.  Respondents, City of Davis and City Council of the City of Davis, and real parties in interest Catherine LeBlanc and Christopher Sanborn, are awarded costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

_____

RENNER, J.


We concur:

/S/

_____

HULL, Acting P. J.


/S/

_____

BUTZ, J.